**Hearing Date**:  August 23, 2016 at 10:00 a.m.
**Objection Deadline**:  August 16, 2016 at 4:00 p.m.

David M. Friedman (DFriedman@kasowitz.com)
Adam L. Shiff (AShiff@kasowitz.com)
Shai Schmidt (SSchmidt@kasowitz.com)
KASOWITZ, BENSON, TORRES
  & FRIEDMAN LLP
1633 Broadway
New York, New York 10019
Telephone:   (212) 506-1700
Facsimile:   (212) 506-1800

*Attorneys for The Renco Group, Inc.*
*and Ira Leon Rennert*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------------X
                                                                         :
In re:                                                                   :            Chapter 7
                                                                         :
MAGNESIUM CORPORATION OF AMERICA, *et al.*,                              :            Case No. 01-14312 (MKV)
                                                                         :
                                        Debtors.                         :            (Jointly Administered)
                                                                         :
------------------------------------------------------------------------X

**OBJECTION OF THE RENCO GROUP, INC. AND IRA LEON RENNERT TO
CHAPTER 7 TRUSTEE'S MOTION FOR ORDER AUTHORIZING AND APPROVING
THE SALE OF THE RENCO LITIGATION INTEREST FREE AND CLEAR OF LIENS
AND OTHER INTERESTS TO SUCCESSFUL BIDDER AT AUCTION**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................. 1

RELEVANT BACKGROUND .................................................................................. 3

I.      PARTIES ....................................................................................................... 3

II.     THE CHAPTER 7 CASES ........................................................................... 4

III.    THE RENCO GROUP LITIGATION .......................................................... 5

IV.     BEUS GILBERT'S RETENTION AS LITIGATION COUNSEL ................... 7

V.      THE STALKING HORSE BID ..................................................................... 8

VI.     THE RENCO PARTIES' OBJECTION TO  THE PROPOSED BIDDING
        PROCEDURES ........................................................................................... 10

VII.    THE TRUSTEE ASSURES THE COURT THAT HE WILL CONSIDER
        ALTERNATIVE DEAL STRUCTURES ...................................................... 11

VIII.   THE RENCO BID ...................................................................................... 11

IX.     THE TRUSTEE REJECTS THE RENCO BID OUT OF HAND  AND
        SELECTS THE AEM BID .......................................................................... 13

OBJECTION .......................................................................................................... 17

I.      THE COURT SHOULD DENY THE MOTION BECAUSE THE PROCESS
        EMPLOYED BY THE TRUSTEE IN PURSUING THE PROPOSED SALE
        WAS INTRINSICALLY FLAWED .............................................................. 17

II.     THE COURT SHOULD DENY THE MOTION BECAUSE THE
        PROPOSED SALE IS NOT IN THE BEST INTEREST OF THE ESTATES ... 22

CONCLUSION ...................................................................................................... 25

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Balco Equities Ltd., Inc.*,
   323 B.R. 85 (Bankr. S.D.N.Y. 2005) ...................................................................17

*In re Bidermann Indus. U.S.A., Inc.*,
   203 B.R. 547 (Bankr. S.D.N.Y. 1997) ................................................................24

*Buchwald v. The Renco Grp.*,
   No. 13-7948 (S.D.N.Y. Mar. 16, 2015) ...............................................................6

*C & J Clark Am., Inc. v. Carol Ruth, Inc. (In re Wingspread Corp.)*,
   92 B.R. 87 (Bankr. S.D.N.Y. 1988) .......................................................17, 18, 21

*In re Canton*,
   No. 05-47802, 2007 WL 2848513 (Bankr. W.D. Wash. Mar. 21, 2007) ...............18

*Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*,
   722 F.2d 1063 (2d Cir. 1983) .............................................................................22

*In re Copy Crafters Quickprint, Inc.*,
   92 B.R. 973 (Bankr. N.D.N.Y. 1988) ..................................................................22

*In re GSC, Inc.*,
   453 B.R. 132 (Bankr. S.D.N.Y. 2011) .................................................................22

*In re Harwald Co.*,
   497 F. 2d 443 (7th Cir. 1974) ............................................................................18

*In re Innkeepers USA Tr.*,
   442 B.R. 227 (Bankr. S.D.N.Y. 2010) .................................................................24

*In re Integrated Res.*,
   135 B.R. 746 (Bankr. S.D.N.Y. 1992) .................................................................17

*In re Jon J. Peterson, Inc.*,
   411 B.R. 131 (Bankr. W.D.N.Y. 2009) ...............................................................17

*In re Jones*,
   374 B.R. 506 (Bankr. E.D.N.Y. 2007) .................................................................20

*Kabro Assocs. v. Colony Hill Assocs. (In re Colony Hill Assocs.)*,
   111 F.3d 269 (2d Cir. 1997) .........................................................................18, 21

*Knapp v. Seligson (In re Ira Haupt & Co.)*,
    361 F.2d 164 (2d Cir. 1966)..................................................................................3

*In re Marvel Entm't Grp., Inc.*,
    234 B.R. 21 (D. Del. 1999)..................................................................................19

*Official Comm. of Unsecured Creditors of Enron Corp. v. Enron Corp. (In re
    Enron Corp.)*,
    335 B.R. 22 (S.D.N.Y. 2005)..............................................................................24

*In re Ohio Corrugating Co.*,
    59 B.R. 11 (Bankr. N.D. Ohio 1985) ..................................................................18

*In re Ozark Rest. Equip. Co., Inc.*,
    850 F.2d 342 (8th Cir. 1988) ..............................................................................24

*Pepper v. Litton*,
    308 U.S. 295 (1939)............................................................................................24

*Pierson & Gaylen v. Creel & Atwood (In re Consol. Bancshares, Inc.)*,
    785 F.2d 1249 (5th Cir. 1986) ............................................................................19

*Ross v. Kirschenbaum (In re Beck Indus., Inc.)*,
    605 F.2d 624 (2d Cir. 1979)..........................................................................18, 22

*Wine Grp. v. Diamante (In re Hat)*,
    310 B.R. 752 (Bankr. E.D. Cal. 2004) ................................................................18

**Statutes**

11 U.S.C. § 326 ................................................................................................ *passim*

11 U.S.C. § 330 ................................................................................................ *passim*

11 U.S.C. § 331 ......................................................................................................8, 16

11 U.S.C. § 363 ................................................................................17, 18, 22, 24

Section 488 of the New York Judiciary Law ...............................................................21

**Other Authorities**

7 N.Y. Jur. 2d ATTORNEYS AT LAW § 429 (2016) ....................................................21

*In re Adoption of Amended Guidelines for the Conduct of Asset Sales* (General
    Order M-383) (Bankr. S.D.N.Y. Nov. 18, 2009)............................................22, 23

The Renco Group, Inc. ("Renco") and Ira Leon Rennert (together with Renco, the "Renco Parties") hereby file this objection (the "Objection") to the motion (the "Motion") of the Chapter 7 Trustee (the "Trustee") for Order Authorizing and Approving the Sale of the Renco Litigation Interest Free and Clear of Liens and Other Interests to Successful Bidder at Auction, and respectfully represent as follows:[1]

## PRELIMINARY STATEMENT[2]

It is axiomatic that a bankruptcy trustee is a fiduciary to the estate that he serves. Every action he takes must be driven by the solemn obligation to maximize the estate's assets and minimize the estate's liabilities. In the instant case, the Trustee faced that obligation when presented with the opportunity to sell a portion of his interest in the Renco Group Litigation. As is evident from the uncontested record, he failed to properly discharge his duties.

The Trustee's failure falls into two distinct categories: (1) his structuring of the transaction, and (2) his refusal to consider the Renco Proposal. Each failure is independently sufficient to require denial of the Sale Motion. When considered together, the evidence is overwhelming.

As to the structure of the sale, the Trustee has required that bidders compete for the right to acquire the Estates' interest in the Judgment *after first deducting a 41% contingency fee to litigation counsel and a 3% fee to the Trustee*. This structure reflects blatant self-dealing among the Trustee and his lawyers as there currently are no legal entitlements of that nature or amount. As more fully explained below, litigation counsel is, at most, entitled to a reasonable

---

[1]     The Declaration of Shai Schmidt in support of this Objection (the "Schmidt Declaration") is attached hereto.

[2]     Capitalized terms used but not defined in this section are ascribed definitions in later sections of this Objection.

fee under Section 330 of the Bankruptcy Code, which must be determined by this Court and which may bear no relationship at all to the stated percentage in its engagement letter. Similarly, the 3% fee reserved by the Trustee for himself, is the ***maximum*** fee to which he might be entitled. Again, the Court must determine what a reasonable fee is for the Trustee and, while that fee is capped at 3% of moneys disbursed, a fee of that magnitude in a case such as this would be unusually generous, if not unprecedented. The structure designed by the Trustee thus commits bidders to the highly unlikely worst-case scenario for professional fees – an outcome plainly detrimental to the Estates although highly favorable to the Trustee and his counsel.

As to the Trustee's refusal to consider the Renco Bid, the breach of fiduciary duty is breathtaking. Renco offered, in exchange for ownership of the Judgment and related litigation rights, the sum of $45 million in cash – $20 million more than AEM's Stalking Horse Bid – in the scenario that Renco ***was victorious*** on appeal. Renco also offered an additional $55 million, for a total of $100 million, if Renco was not victorious. In either scenario, Renco also offered to assume the Estates' liabilities to the PBGC, as well as their liabilities to the EPA, which the Trustee has estimated to amount to "a very substantial claim . . . at least tens of millions of dollars and possibly hundreds of millions of dollars." July 14, 2016 Hr'g Tr. at 40:10-13.[3] In support of its proposal, Renco demonstrated to the Trustee that, in the same manner that the Trustee's proposed sale of a 25% interest in the litigation did not trigger a contingency fee, neither did a sale of a 100% interest. Because such a fee was not triggered, Renco's proposal was superior with regard to recoveries to unsecured creditors even under a scenario where Renco's appeal was unsuccessful.

---

[3]      A true and correct copy of the July 14, 2016 hearing transcript is attached as <u>Exhibit A</u> to the Schmidt Declaration.

The Trustee refused – out of hand – to engage with Renco.  Within **two hours** of Renco's

sending an e-mail to the Trustee outlining the terms of its proposal, Mr. Kajon, counsel for the

Trustee, responded that the proposal was not better than that of AEM and had unidentified

"structural problems."  In that same e-mail, Mr. Kajon informed Renco that its bid would not be

considered at the auction and denied Renco the opportunity to attend.  Following through on his

threat, when Renco's counsel arrived at the auction, he was threatened with physical removal by

building security, notwithstanding the fact that the auction was attended by various other parties

in interest.

In support of his motion for approval of bidding procedures, the Trustee represented to

the Court that his goal was to "get Renco to the table" and that he would, in good faith,

"welcome alternative structures" to the proposed transaction.  July 14, 2016 Hr'g Tr. at 76:24-25.

Plainly, these were misrepresentations.  Renco, a multi-billion-dollar enterprise, came to the

table with a fully-funded proposal well in excess of the Stalking Horse Bid.  The Trustee

responded with the back of his hand – rejecting the proposal in just two hours and never even

attempting to identify, let alone resolve, the so-called "problems" with Renco's proposal.  In so

doing, his personal interests and animus towards Renco overtook his duties to the Estates.

In an oft-quoted observation, Judge Friendly once said that the "conduct of bankruptcy

proceedings not only should be right but must seem right."  *Knapp v. Seligson (In re Ira Haupt &*

*Co.)*, 361 F.2d 164, 168 (2d Cir. 1966).  The Sale Motion plainly is not right and certainly does

not "seem right," and it must be denied.

## RELEVANT BACKGROUND

### I.    PARTIES

1.    Renco is a privately held New York corporation.  Renco is the sole shareholder of

Renco Metals, Inc. ("Renco Metals"), a Delaware corporation and a debtor in the above-

captioned Chapter 7 cases (the "Chapter 7 Cases").

2. Ira Leon Rennert and certain members of his family are the beneficial owners of Renco, owning all of Renco's stock either directly or indirectly through trusts, which were established for the benefit of Mr. Rennert and certain members of his family.

3. Magnesium Corporation of America ("MagCorp," and together with Renco Metals, the "Debtors"), which is also a debtor in the Chapter 7 Cases, is wholly owned by Renco Metals.  Until the sale of substantially all of its assets to US Magnesium LLC in June 2002, MagCorp was engaged in the production of magnesium extracted from the brine of the Great Salt Lake in Utah.

4. Lee E. Buchwald is the Trustee in the Chapter 7 Cases.

5. AEM SPV, LLC ("AEM") is the entity that the Motion requests be approved as Buyer of the "Renco Litigation Interest" under the Proposed Sale (as such term is defined below).

## II. THE CHAPTER 7 CASES

6. In August 2001, MagCorp and Renco Metals filed for bankruptcy under Chapter 11 of the Bankruptcy Code.  In 2003, the Court converted the cases to Chapter 7 and appointed the Trustee.

7. The Debtors' claims register reflects claims in an aggregate amount of approximately $670 million.  This amount includes multiple claims filed by the PBGC.  In addition, the United States Environmental Protection Agency (the "EPA") has asserted claims against the Debtors in *United States of America v. Magnesium Corp. of America*, No. 01-0040B (D. Utah) (the "EPA Litigation").

### III.    THE RENCO GROUP LITIGATION

8.    In 1996 (five years before the bankruptcy filing), after considering its strong financial position at the time and the prospects for continued growth of the magnesium industry, Renco Metals undertook a $150 million bond offering (the "1996 Notes" and the "Bond Offering," respectively).  As Renco Metals expressly disclosed in the prospectus dated June 28, 1996 (the "Prospectus"), one of the main purposes of the Bond Offering was to facilitate the payment of dividends by Renco Metals to Renco.

9.    In keeping with the plan laid out in the Prospectus, in July 1996, contemporaneously with the closing of the Bond Offering, Renco Metals made a $75.7 million dividend payment to Renco, using the proceeds from the Bond Offering.  Through October 1998, as expressly contemplated by the Prospectus and permitted by the indenture, Renco Metals made additional dividend payments, totaling approximately $14 million (collectively, the "Dividends").

10.    In 2003 – seven years after the Bond Offering – the Trustee commenced an adversary proceeding in this Court (whose reference was later withdrawn to the District Court for the Southern District of New York), alleging more than fifty counts against the Renco Parties along with many other individuals and corporations (the "Renco Group Litigation").  The Trustee's complaint alleged that the payment of the Dividends, along with other transfers, were fraudulent transfers under the Bankruptcy Code and New York law because, among other things, Renco Metals was allegedly insolvent when it paid the Dividends.

11.    On February 27, 2015, after a trial, the jury reached a verdict (the "Verdict") finding that Renco Metals was *solvent* when it paid the Dividends.  The jury further found that Renco Metals was not left with "unreasonably small capital" when it paid the Dividends, and that it never "intended or believed that it would incur debts beyond its ability to pay as they became

5

due because of the transfers."  Based on those findings, the jury concluded that the Renco Parties were not liable for fraudulent conveyances under federal law.  However, the jury found the Renco Parties liable on the Trustee's claim for fraudulent transfers under New York law, *even though a finding of insolvency was necessary for reaching that conclusion* (as the court made clear in its jury instructions).  The jury also found Mr. Rennert liable for unjust enrichment.  It awarded $101 million in compensatory damages and $1 million in punitive damages against Renco, as well as over $16.2 million in compensatory damages against Mr. Rennert.

12.     On post-trial motions, the trial court struck the jury's unjust enrichment and punitive damages verdicts as a matter of law.  On August 24, 2015, the court entered the final judgment of over $183 million against Renco and $29 million against Mr. Rennert (including prejudgment interest), totaling $213,199,093.70 (the "Judgment").

13.     The Renco Parties filed an appeal from the Judgment with the United States Court of Appeals for the Second Circuit (the "Appeal"), arguing, among other things, that the Verdict was the result of an impermissible compromise to punish the Renco Parties with damages even though all of the jurors believed that Renco Metals was solvent when it paid the Dividends.  The Trustee filed a cross-appeal in connection with the $96 million prejudgment interest awarded under the Judgment, which was calculated under New York law based on a 6% interest rate and determined by the District Court to be the appropriate amount "to compensate the wronged party fully, while avoiding providing a windfall to Plaintiff."  *Buchwald v. The Renco Grp.*, No. 13-7948 (S.D.N.Y. Mar. 16, 2015) [Docket No. 342] (internal quotation marks omitted) (the "Cross-Appeal").  The Cross-Appeal is based on the Trustee's argument that the prejudgment interest should have been calculated based on Delaware law – not New York law – even though the Trustee had *specifically* requested that the District Court calculate the interest under New York

law.  The Trustee therefore waived the argument that the District Court should have applied

Delaware law.  Furthermore, in both Delaware and New York, trial courts have broad discretion

to determine prejudgment interest awards.  Therefore, it is highly likely that the District Court –

which specifically ruled that the awarded interest was the appropriate amount "to compensate the

wronged party fully, while avoiding providing a windfall to Plaintiff" – would have awarded the

same amount of prejudgment interest even if it had applied Delaware law.  The Cross-Appeal is

therefore meritless.

14.    The Appeal and Cross-Appeal are fully briefed and oral argument has not yet

been scheduled.

## IV.    BEUS GILBERT'S RETENTION AS LITIGATION COUNSEL

15.    On September 10, 2003, the Trustee retained Beus Gilbert PLLC ("Beus Gilbert")

as litigation counsel in the Renco Group Litigation.  Beus Gilbert's retention agreement with the

Trustee (the "Beus Gilbert Retention Agreement") provided for a sliding scale of contingency

fees, including "41% of the Gross Recovery received by **settlement or agreement** [with

Defendants], **verdict or judgment** . . . ."  Beus Gilbert Retention Agreement at ¶ 2.1 (emphasis

added).  A true and correct copy of the Beus Gilbert Retention Agreement is attached as Exhibit

B to the Schmidt Declaration.

16.    Based on the clear terms of the Beus Gilbert Retention Agreement, and by the

Trustee's own admission, a sale of an interest in the Judgment does not trigger Beus Gilbert's

contingency fee.  *See* July 14, 2016 Hr'g Tr. at 39:5-40:8 (the Trustee testifying that out of the

$25 million received by the Estates under the AEM Purchase Agreement, $5 million would be

used to pay certain expenses of professionals, and the remaining $20 million would be used to

pay unsecured creditors).  *See* Schmidt Declaration, Ex. A.

7

17.    By an order dated October 31, 2003, the Court authorized the retention of Beus Gilbert, provided that "all compensation of Beus Gilbert PLLC shall be subject to approval of the Court pursuant to 11 U.S.C. §§ 330 and 331" ("Beus Gilbert Retention Order").  [Docket No. 448].

## V.    THE STALKING HORSE BID

18.    On June 23, 2016 – without prior notice to or discussion with his constituents, the "long-suffering general unsecured creditors" (Motion at ¶ 1) – the Trustee moved the Court to approve bidding procedures designating AEM, a litigation funder, as the "stalking horse" bidder pursuant to an asset purchase agreement between the Trustee and AEM (the "AEM Purchase Agreement"), which contemplated the sale of the "Renco Litigation Interest" for a purchase price of $25,000,000 (the "Stalking Horse Bid").  Motion at ¶ 41.  Under the Stalking Horse Bid, the "Renco Litigation Interest" was defined as the right to receive (i) $53,750,000, plus (ii) a 10% per annum investment return on the purchase price, from the "Net Proceeds."  "Net Proceeds" were defined under the AEM Purchase Agreement as any cash or other consideration that the Trustee and/or the Debtors receive in satisfaction of the Judgment and the Cross-Appeal (the "Gross Recoveries"), after deducting (i) 3% of the Gross Recoveries on account of the Trustee's Chapter 7 commissions; (ii) the Trustee's appellate counsel's sliding contingency fee, up to a maximum of $2,000,000; and (iii) 41% of the Gross Recoveries on account of the alleged contingency fee of Beus Gilbert.  AEM Purchase Agreement, §§ 1.01, 2.01.

19.    The Stalking Horse Bid put forth by the Trustee made no mention of the Court's authority and obligation, as explicitly provided under the Beus Gilbert Retention Order, to determine and allow Beus Gilbert's fees under Sections 330 and 331 of the Bankruptcy Code. Nor did it explain that, under Section 326 of the Bankruptcy Code, the Trustee is entitled to a *maximum* fee of 3% "of the moneys *disbursed* . . . in the case by the trustee to parties in interest"

8

– not moneys recovered by the Debtors' estates (the "Estates") (emphasis added).  11 U.S.C. §

326.  Thus, the Stalking Horse Bid reflects an attempt to fix the payment to Beus Gilbert of the

full 41% of the Gross Recoveries – in the potential amount of **$87,400,000** – per the Beus Gilbert

Retention Agreement, and the payment to the Trustee of 3% of the gross recoveries on the

Judgment.  Moreover, the Stalking Horse Bid plainly chilled the bidding process by forcing

potential bidders to tailor their bids pursuant to the erroneous assumption that the foregoing fees

*must* be paid in full as part of the final transaction.

20.     The Stalking Horse Bid thus established the following alternatives:

- If the Trustee loses the Appeal and the Cross-Appeal, the Estates will recover
  the sum of **$25,000,000**.[4]

- If the Trustee wins the Appeal and loses the Cross-Appeal, thus retaining the
  $213,200,000 Judgment, the Estates will recover the sum of **$89,150,000**,
  inclusive of the $25,000,000 purchase price.[5]

21.     Under the Stalking Horse Bid, AEM did not agree to assume *any* debt, liability or

obligation of the Trustee or the Debtors of any kind or nature whatsoever.[6]  AEM Purchase

Agreement, § 2.02.

22.     The Trustee further sought the approval of certain bidding procedures (the

"Bidding Procedures"), including the following bid protections for AEM as a stalking horse:

---

[4]     The Trustee testified that he intends to use $5 million out of these proceeds to pay certain professional
expenses.

[5]     This amount was derived from the deduction of the following amounts from the $213,200,000 Judgment, as
required under the Bidding Procedures:  (i) the proposed 3% Chapter 7 commissions in the amount of $6,400,000;
(ii) the Trustee's appellate counsel's $1.5 million contingency fee; (iii) Beus Gilbert's 41% contingency fee in the
amount of $87,400,000; and (iv) the "Renco Litigation Consideration" in the amount of $53,750,000.

[6]     As noted above, the Debtors' claims register reflects claims in an aggregate amount of approximately $670
million.  This amount includes multiple claims filed by the PBGC.  In addition, the EPA has asserted claims against
the Debtors in the EPA Litigation.

(i) a break-up fee in the amount of $1,000,000 (the "Break-Up Fee"); and (ii) reimbursement of

certain expenses in an amount not to exceed $50,000.  Motion at ¶ 44.

## VI.    THE RENCO PARTIES' OBJECTION TO THE PROPOSED BIDDING PROCEDURES

23.    On July 7, 2016, the Renco Parties filed an objection to the Motion seeking

approval of the Bidding Procedures and Break-Up Fee (the "Bidding Procedures Objection").

[Docket No. 718].  Attached to the Bidding Procedures Objection was a term sheet, setting forth

Renco's offer to purchase the Trustee's rights in the Renco Group Litigation for a consideration

of $35 million in cash if the Trustee loses the Appeal, and $100 million if the Trustee wins the

Appeal ("Renco's Original Offer").  Bidding Procedures Objection, Ex. A.

24.    As additional consideration, Renco offered to assume the Estates' liabilities (if

any) to the PBGC set forth in the claims numbered 0675 through 0722 in the Debtors' claims

register (the "PBGC Claims"), and in connection with the EPA claims that have been asserted in

the EPA Litigation and indemnify the Estates against the these liabilities.

25.    The Renco Parties objected to the Break-Up Fee on the basis that another bidder

(Renco) had emerged and a break-up fee was not necessary to maximize the auction process.

The Court denied the Bidding Procedures Objection and approved the Break-Up Fee.

26.    An additional objection to the Bidding Procedures was filed on July 7, 2016 by

Jefferies LLC, a large holder of the 1996 Notes ("Jefferies" and the "Jefferies Objection,"

respectively).  [Docket No. 716].  Jefferies argued, among other things, that the Motion

contained no meaningful information to allow creditors to evaluate whether pursuing the

Stalking Horse Bid was in the best interests of the Estates.

## VII.   THE TRUSTEE ASSURES THE COURT THAT HE WILL CONSIDER ALTERNATIVE DEAL STRUCTURES

27.     On July 12, 2016, the Trustee filed an omnibus reply to the Bidding Procedures Objection and the Jefferies Objection.  [Docket No. 721].  Ostensibly recognizing the impropriety of bidding procedures that chill bidding by precluding the participation of parties offering to buy the Renco Group Litigation, the Trustee asserted that – notwithstanding the fact that the Bidding Procedures clearly contemplated the exclusion of such offers – he would consider structures that are different from the structure adopted under the AEM Purchase Agreement.  *Id.* at ¶¶ 2, 22 ("the Bidding Procedures *expressly* welcome alternative structures") (emphasis in original).  Counsel for the Trustee reiterated this assurance before the Court at the July 14, 2016 hearing on the Bidding Procedures.  July 14, 2016 Hr'g Tr. at 76:24-25 ("The bid protections expressly welcome alternative transactions.").  *See* Schmidt Declaration, Ex. A.

28.     On July 18, 2016, the Court entered an order approving the Bidding Procedures; setting August 9, 2016 as the Bid Deadline; scheduling an auction (if necessary) for August 11, 2016; and scheduling the final Sale Hearing for August 23, 2016.  [Docket No. 724].

## VIII.   THE RENCO BID

29.     On August 8, 2016 (a full day prior to the deadline for submitting bids), Renco – relying on the Trustee's assurances that he would not dismiss a bid merely because it does not conform to the structure proposed under the AEM Purchase Agreement – sent a term sheet to the Trustee, summarizing its bid for the purchase of the Trustee's rights in the Renco Group Litigation (the "Renco Term Sheet" and the "Renco Bid," respectively).  A true and correct copy of the Renco Term Sheet and the cover letter accompanying it is attached as Exhibit C to the Schmidt Declaration.

30.     As set forth in the Renco Term Sheet, in exchange for the assignment by the
Trustee to an affiliate of Renco of all of the Trustee's rights, title and interest in the Renco Group
Litigation, Renco, through an affiliate thereof, agreed to pay to the Estates the sum of **$45
million** in cash if the Trustee loses the Appeal (*i.e.*, an increase of $10 million relative to
Renco's Original Offer) and another $55 million for a total of **$100 million** in cash if the Trustee
wins the Appeal.  The Renco Bid thus beat the Stalking Horse Bid by $20 million (an 80%
increase) on the low end, and by approximately $11 million (a 12% increase) on the high end,
even before factoring in the substantial benefits stemming from Renco's assumption of the
Assumed Liabilities (as such term is defined below).

31.     As previously explained in the Bidding Procedures Objection, a sale of the Renco
Group Litigation to a third party – as proposed under the Renco Bid – would not trigger a
contingency fee under the terms of the Beus Gilbert Retention Agreement, pursuant to which
"Client agrees to pay Counsel . . . 41% of the Gross Recovery received by **settlement or
agreement** [**with Defendants**], **verdict or judgment** . . . .").  In the same manner as the Stalking
Horse Bid for a 25% interest in the Judgment did not trigger a contingency fee, under the Renco
Bid, the purchase of 100% of the Trustee's rights in the Renco Group Litigation would not
trigger such a fee.

32.     As additional consideration, the Renco Bid contained an assumption of (i) the
PBGC Claims, (ii) the EPA claims that have been asserted in the EPA Litigation, and (iii) any
EPA claims relating to the Comprehensive Environmental Response, Compensation, and
Liability Act of 1980 (CERCLA) that have not yet been filed (collectively, the "Assumed
Liabilities") and indemnify the Estates against the Assumed Liabilities.  This incremental
consideration – which, as described above, was not offered under the Stalking Horse Bid –

12

would eliminate in their entirety the contingent claims against the Estates that likely will take

years to resolve, thereby permitting the Trustee to promptly make distributions to the "long-

suffering general unsecured creditors" who, as the Trustee has acknowledged, have waited many

years to be paid.  Motion at ¶ 1.

### IX.    THE TRUSTEE REJECTS THE RENCO BID OUT OF HAND AND SELECTS THE AEM BID

33.    *Two hours* after receiving the Renco Term Sheet, the Trustee – completely

ignoring Renco's explanation in the cover letter accompanying the Renco Term Sheet as to why

its bid was far better for the Estates than the Stalking Horse Bid – apprised Renco in an e-mail

that "the economic terms of the offer you transmitted today . . . are not 'better for the estates than

the terms of the AEM Sale Agreement'" and that "[t]herefore, you have no right to attend the

auction."  The Trustee's e-mail, however, provided *no* explanation as to why the economic terms

proposed by Renco were "not better for the estates than the terms of the AEM Sale Agreement."

34.    The Trustee further stated that – notwithstanding his previous assurances to the

Court that the Bidding Procedures welcome alternative structures – "*even if* the economic terms

were acceptable . . . *there are a number of structural problems with Renco's bid* including those

raised in our reply to your opposition papers" (emphases added).  The Trustee, however, did not

offer to engage with Renco to remedy – or even identify – the "structural problems" perceived by

the Trustee, in order to maximize the potential value to the Estates from the Renco Bid.[7]  A true

and correct copy of the Trustee's August 8, 2016 e-mail is attached as <u>Exhibit D</u> to the Schmidt

Declaration.

---

[7]    The Bidding Procedures provide that "if the Trustee receives a bid prior to the Bid Deadline that is not a Qualified Bid the trustee may provide the Bidder with the opportunity to remedy any deficiencies prior to the Auction."  Bidding Procedures at 8.

35.     On August 9, 2016, Renco, through an affiliate thereof, submitted the Renco Bid to the Trustee, which included its proposed sale agreement (the "Agreement") along with a copy of the Agreement marked against the AEM Purchase Agreement to show all changes proposed by Renco.  In the cover letter accompanying the Renco Bid, Renco apprised the Trustee that in light of his rejection out-of-hand of Renco's proposal, as reflected in his August 8, 2016 e-mail, Renco would not be wiring at that point the $4.5 million Good Faith Deposit required under the Bidding Procedures.[8]  Renco further noted that if the Trustee changed his mind and properly considered the Renco Bid to be a Qualified Bid, Renco would execute the Agreement and transfer the Good Faith Deposit immediately.[9]  A true and correct copy of the Renco Bid and the cover letter accompanying it is attached as Exhibit E to the Schmidt Declaration.

36.     On August 10, 2016, in response to Renco's query as to whether an auction would take place the following day, the Trustee stated that while he intended to conduct an auction, the Renco Bid was "not a Qualified Bid for the reasons set forth in my August 8 email, as well as Renco's failure to submit a deposit, provide proof of financial ability and other deficiencies under the Bidding Procedures."  Therefore, the Trustee concluded, "Renco cannot attend the Auction."  A true and correct copy of the Trustee's August 10, 2016 e-mail is attached as Exhibit F to the Schmidt Declaration.

---

[8]     Given the pending litigation between the Renco Parties and the Trustee, Renco deemed it prudent to withhold the Good Faith Deposit until the Trustee notified Renco that he considered the Renco Bid to be a Qualified Bid.

[9]     Renco further stated in its letter that because the Trustee had sufficient information concerning the financial wherewithal of Renco as a result of the litigation that is the subject of the Renco Litigation Interest, additional information in connection therewith would be provided as necessary.  Renco also submitted that, because it did not require any diligence or additional information from the Trustee, the execution of a confidentiality agreement was unnecessary at that point.  In addition, Renco stated that it would provide proof of corporate authorization to consummate the proposed transaction as necessary.

37.     Renco immediately responded in an e-mail stating that it disagreed with the

Trustee's conclusion.  A true and correct copy of Renco's August 10, 2016 e-mail to the Trustee

is attached as Exhibit G to the Schmidt Declaration.

38.     The Trustee, however, still did not offer to engage with Renco to remedy the

issues that – in the Trustee's opinion – prevented the Renco Bid from being deemed a Qualified

Bid, or attempt to negotiate the economic terms of the Renco Bid.  The Trustee also failed to

inform Renco as to whether other parties had submitted Qualified Bids, and – upon information

and belief – never informed the Debtors' stakeholders (*e.g.*, bondholders, the EPA and PBGC) of

the Renco Bid.

39.     Wishing to observe the auction as a party-in-interest, Renco asked its undersigned

counsel to attend the auction in person.  After Mr. Schmidt arrived at the offices of the Trustee's

counsel to attend the auction, however, Trustee's counsel demanded that he leave immediately

and threatened to have him physically removed.  Notably, counsel for Jefferies – which was not a

Qualified Bidder – was allowed to stay and attend the auction, along with multiple other parties-

in-interest.  *See* Schmidt Declaration at ¶ 9.

40.     On August 12, 2016, the Trustee filed with the Court a Notice of Auction Results

and Terms of Successful Bid, in which the Trustee declared that *only one Qualified Bid* (other

than the Stalking Horse Bid) was submitted prior to the auction, and that the "best bid at the

Auction was submitted by AEM in the amount of $26.2 million, which also entailed a reduction

in the amount of the Renco Litigation Consideration that is payable by the Debtors' estates to the

Buyer from $53,750,000 to $50,000,000 (the "Revised AEM Purchase Agreement").  [Docket

No. 729].

41.    The Revised AEM Purchase Agreement thus establishes the following

alternatives:

- If the Trustee loses the Appeal and the Cross-Appeal, the Estates will recover the sum of **$26,200,000**.

- If the Trustee wins the Appeal and loses the Cross-Appeal, thus retaining the $213,200,000 Judgment, the Estates will recover the sum of **$94,100,000**, inclusive of the $26,200,000 purchase price.[10]

42.    Under the Revised AEM Purchase Agreement, AEM is not assuming *any* debt,

liability or obligation of the Trustee or the Debtors of any kind or nature whatsoever.  Revised

AEM Purchase Agreement, § 2.02.

43.    The Revised AEM Purchase Agreement – like the Stalking Horse Bid – makes no

mention of the Court's authority, as explicitly preserved under the Beus Gilbert Retention Order,

to examine Beus Gilbert's fees under Sections 330 and 331 of the Bankruptcy Code.  Nor does it

explain that, under Section 326 of the Bankruptcy Code, the Trustee is entitled to a *maximum* fee

of 3% "of the moneys *disbursed* . . . in the case by the trustee to parties in interest" – not moneys

recovered by the Estates (emphasis added).  The Revised AEM Purchase Agreement thus

assumes – like the Stalking Horse Bid – the payment to Beus Gilbert of the full 41% of the Gross

Recoveries – in the potential amount of **$87,400,000** – per the Beus Gilbert Retention

Agreement, and the payment to the Trustee of 3% of the gross recoveries on the Judgment.

Revised AEM Purchase Agreement, §§ 1.01, 2.01.

---

[10]    This amount is derived from the deduction of the following amounts from the $213,200,000 Judgment: (i) the proposed 3% Chapter 7 commissions in the amount of $6,400,000; (ii) the Trustee's appellate counsel's $1.5 million contingency fee; (iii) Beus Gilbert's 41% contingency fee in the amount of $87,400,000; and (iv) the "Renco Litigation Consideration" in the amount of $50,000,000.

44.     The Revised AEM Purchase Agreement further provides that a 13% per annum investment return on the purchase price, in the amount of $26,200,000, will accrue daily beginning on the one-year anniversary of the date of the closing, compounding annually.  *Id.*

45.     In light of the foregoing, the Renco Bid beats the Revised AEM Purchase Agreement by $18.8 million on the low end, and by approximately $5.9 million on the high end, even before factoring in the additional interest paid to AEM as an "investment return" on the purchase price, or the substantial benefits stemming from Renco's assumption of the Assumed Liabilities.

46.     A hearing to consider the proposed sale pursuant to the Revised AEM Purchase Agreement (the "Proposed Sale") is scheduled for August 23, 2016.

## OBJECTION

## I.   THE COURT SHOULD DENY THE MOTION BECAUSE THE PROCESS EMPLOYED BY THE TRUSTEE IN PURSUING THE PROPOSED SALE WAS INTRINSICALLY FLAWED

47.     "As an officer of the Court and as a representative of the Debtor's creditors, the Trustee has a duty to realize the maximum return for the estate for further distribution to the Debtor's creditors."  *In re Balco Equities Ltd., Inc.*, 323 B.R. 85, 98 (Bankr. S.D.N.Y. 2005) (internal quotation marks omitted).  In the context of Section 363 asset sales, the debtor's "main responsibility, and the primary concern of the bankruptcy court, is the maximization of the value of the asset sold."  *In re Integrated Res.*, 135 B.R. 746, 750 (Bankr. S.D.N.Y. 1992).  *See also In re Jon J. Peterson, Inc.*, 411 B.R. 131, 137 (Bankr. W.D.N.Y. 2009) ("The purpose and goal of any asset sale is to maximize the recovery of value for the benefit of the bankruptcy estate.").

48.     To ensure the value-maximization of the asset sold, courts have recognized the importance of preserving the "integrity of the sale process."  *C & J Clark Am., Inc. v. Carol Ruth, Inc. (In re Wingspread Corp.)*, 92 B.R. 87, 92 (Bankr. S.D.N.Y. 1988).  An open and fair

sale process that places all bidders on equal footing encourages the submission of competitive

bids and, in turn, maximizes the value received by the estate for the sold assets.  Espousing this

rationale, the Court of Appeals for the Second Circuit has ruled that a Section 363 asset sale must

not be approved where the sale process was "intrinsically unfair."  *Kabro Assocs. v. Colony Hill*

*Assocs. (In re Colony Hill Assocs.)*, 111 F.3d 269, 274 (2d Cir. 1997) ("Courts . . . properly

entertain suits challenging the equity of a bankruptcy sale transaction, on the assumption that

sales tinged by fraud, mistake or unfairness would generally result in an accepted bid below that

which might have been expected in a fair, free market situation.") (citing *In re Harwald Co.*, 497

F. 2d 443, 444-45 (7th Cir. 1974)); *see also Wingspread*, 92 B.R. at 92 (an asset sale will not be

upheld if it is "tinged with fraud, error or similar defects which would in equity affect the

validity of any private transactions"); *In re Canton*, No. 05-47802, 2007 WL 2848513, at *2

(Bankr. W.D. Wash. Mar. 21, 2007) (a bankruptcy court must examine evidence pertaining to the

"intrinsic structure of the sale" to ensure that it does not involve "fraud, deceit, mistake of fact or

other inequitable overreaching") (internal citations omitted); *Wine Grp. v. Diamante (In re Hat)*,

310 B.R. 752, 758 (Bankr. E.D. Cal. 2004) (same).[11]

49.     Where the sale process is flawed and competitive bidding has been stifled, courts

require that a new process begin.  *Ross v. Kirschenbaum (In re Beck Indus., Inc.)*, 605 F.2d 624,

637 (2d Cir. 1979) ("Our conclusion that bidding was chilled dictates a new auction free from

the chill."); *see also In re Hat*, 310 B.R. at 759 ("The conclusion that bidding has been

impermissibly chilled dictates a new sale."); *In re Ohio Corrugating Co.*, 59 B.R. 11, 13 (Bankr.

N.D. Ohio 1985) (a finding that the competition for the assets may have been stifled dictates a

---

[11]     Renco, being Renco Metals' sole shareholder and having submitted a bid to the Trustee, has standing to
challenge the Proposed Sale as "intrinsically unfair."  *Colony Hill Assocs.*, 111 F.3d at 274.

new process).

50.     Far from ensuring the integrity of the sale process for the benefit of the Estates,

the Trustee put forth a proposal which assumed (i) the payment of Beus Gilbert's 41%

contingency fee – in the staggering potential amount of **$87,400,000** – notwithstanding the fact

that, as explicitly provided in the Beus Gilbert Retention Order, any fees paid to Beus Gilbert

must be found reasonable and approved by the Court pursuant to Section 330 of the Bankruptcy

Code, and (ii) the payment of 3% of the "Gross Recoveries" on the Judgment on account of the

Trustee's Chapter 7 commissions, notwithstanding the fact that under Section 326 of the

Bankruptcy Code, the Trustee is entitled to a *maximum* fee of 3% "of the moneys *disbursed . . .*

in the case by the trustee to parties in interest" – not moneys recovered by the Estates (emphasis

added).  Revised AEM Purchase Agreement, §§ 1.01, 2.01.

51.     The Court should not allow the Trustee to circumvent the provisions of the

Bankruptcy Code and the Beus Gilbert Retention Order – which the Trustee failed to cite in his

Motion – by means of seeking approval of the Proposed Sale.  It is well-settled law that "the fact

that debtor's counsel made an agreement with the debtor to obtain [] a contingency [fee] does not

require the bankruptcy court to approve it . . . ."  *Pierson & Gaylen v. Creel & Atwood (In re*

*Consol. Bancshares, Inc.)*, 785 F.2d 1249, 1257 (5th Cir. 1986).

52.     Furthermore, the Court should not countenance the Trustee's attempt to mislead

the Court into approving his own excessive commission by failing to cite in his Motion the

provisions of Section 326 of the Bankruptcy Code.  *See In re Marvel Entm't Grp., Inc.*, 234 B.R.

21, 38-39 (D. Del. 1999) (Section 326 does "not establish that a trustee should be paid a

commission or percentage of amounts disbursed from the estate. The words in the statute are

straight forward:  they set a cap or limitation on compensation that might otherwise be paid

under section 330."); *In re Jones*, 374 B.R. 506, 509 (Bankr. E.D.N.Y. 2007) (the court must

determine whether the statutory maximum compensation under Section 326 exceeds reasonable

compensation for the services rendered).  The Court should disallow the Proposed Sale for this

reason alone.[12]

53.     Relatedly, the process employed by the Trustee was fatally flawed because by

putting forth the Stalking Horse Bid, which assumed full payment of the Trustee's commission

and Beus Gilbert's contingency fee, the Trustee chilled the bidding process by forcing potential

bidders to tailor their bids pursuant to the erroneous assumption that the foregoing fees *must* be

paid in full as part of the final transaction.

54.     The flawed process employed by the Trustee in pursuing the Proposed Sale is

further evinced by the Trustee's refusal to engage with Renco – let alone seriously consider its

bid – even though the Renco Bid beat the Stalking Horse Bid by $20 million on the low end, and

by approximately $11 million on the high end, and offered to eliminate, in their entirety, the

contingent claims against the Estates – estimated by the Trustee as "very substantial" – that

likely will take years to resolve.  Upon information and belief, the Trustee also failed to engage

with other stakeholders of the Debtors to gauge whether any additional parties would consider

making an offer for the Renco Group Litigation.  It is indeed no wonder that, as a result of this

feeble sale process, the Trustee was able to attract *only one* Qualified Bid (other than AEM's

bid) prior to the auction.

55.     Furthermore, after the Renco Parties warned in the Bidding Procedures Objection

---

[12]     As to the 3% Chapter 7 trustee fee, the evidence of misleading conduct by the Trustee is manifest.  The Trustee testified at the July 14, 2016 hearing that it was his understanding that every Chapter 7 trustee gets 3% of funds collected.  July 14, 2016 Hr'g Tr. at 56:8-16.  Counsel for the Trustee made no attempt to correct this plainly wrong assertion on the record, thus exacerbating the Trustee's improper failure to cite in his Motion the provisions of Section 326 of the Bankruptcy Code.

that the Bidding Procedures may result in a forfeiture by the Estates of $87,400,000 (which could

be avoided under alternative deal structures), the Trustee assured the Court that he would

consider bids that are based on structures different from that proposed under the Stalking Horse

Bid.[13]  That the Trustee had no intention of living up to his promise, however, was clearly

demonstrated when he refused to consider the Renco Bid.  *See* Schmidt Declaration, Ex. C.

56.    The Renco Parties are baffled by the Trustee's refusal to consider the Renco Bid,

or at least engage with Renco in a good faith attempt to cure the "structural problems" perceived

by the Trustee.  There can be no reasonable, good faith basis for refusing to even consider a

proposal that plainly offers a greater recovery for the Estates than any other existing offer, and

the assumption of claims the Trustee has estimated to amount to "a very substantial claim . . . at

least tens of millions of dollars and possibly hundreds of millions of dollars."  July 14, 2016 Hr'g

Tr. at 40:10-13.  But whatever the motives behind the Trustee's conduct may be, it is clear that

the foregoing cannot be reconciled with the Trustee's duties to preserve the "integrity of the sale

process" and to maximize the value of the Estates.  *Wingspread*, 92 B.R. at 92.  Nor can the

process employed by the Trustee in pursuing the Proposed Sale be described as "intrinsically

fair."  *Colony Hill Assocs.*, 111 F.3d at 274.

57.    In light of the foregoing, the Court should deny the Motion and the Proposed Sale.

Furthermore, because the Trustee has shown that he is incapable – or unwilling – to conduct a

---

[13]    As explained above, a sale of the Renco Group Litigation to a third party – as proposed under the Renco
Bid – would not trigger the contingency fee under the Beus Gilbert Retention Agreement in the potential amount of
$87,400,000.  Furthermore, even if its terms were ambiguous, the Beus Gilbert Retention Agreement should not be
interpreted as to grant Beus Gilbert the right to receive 41% of the proceeds from a sale of the underlying litigation
because such an agreement would be illegal under Section 488 of the New York Judiciary Law ("An attorney or
counselor shall not . . . [d]irectly or indirectly, buy, take an assignment of or be in any manner interested in buying
or taking an assignment of a . . . thing in action, with the intent and for the purpose of bringing an action thereon.").
*See also* 7 N.Y. Jur. 2d ATTORNEYS AT LAW § 429 (2016) ("In addition to the Judiciary Law making it a crime for an
attorney, directly or indirectly, to buy or take an assignment of a claim for the purpose of bringing an action on it, the
Rules of Professional Conduct prohibit a lawyer from acquiring a proprietary interest in the cause of action or subject
matter of litigation he or she is conducting for a client.").

fair and open sale process, the Court should appoint an alternative, neutral professional to
conduct "a new auction free from the chill" as a fiduciary of the Estates. *Beck Indus.*, 605 F.2d
at 637.

## II.   THE COURT SHOULD DENY THE MOTION BECAUSE THE PROPOSED SALE IS NOT IN THE BEST INTEREST OF THE ESTATES

58.     In the Second Circuit, the guiding principle for judicial approval of non-"ordinary
course" transactions under Section 363(b) of the Bankruptcy Code is "the best interest of the
estate." *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071
(2d Cir. 1983) (Section 363(b) approval requires consideration of whether proposed transaction
will "further the diverse interests of the debtor, creditors, and equity holders, alike."); *In re Copy
Crafters Quickprint, Inc.*, 92 B.R. 973, 983 (Bankr. N.D.N.Y. 1988) (Section 363(b) "can
provide an expeditious avenue for the transfer of property . . . if in the best interests of the
estate"). Furthermore, "[t]o sell property under section 363(b), the Trustee must demonstrate a
legitimate business justification for the proposed transaction." *In re GSC, Inc.*, 453 B.R. 132,
155 (Bankr. S.D.N.Y. 2011).[14]

59.     The Board of Judges of the Southern District of New York has espoused the
foregoing principles, instructing that "the motion and the evidence presented or proffered at any
sale hearing should be sufficient to enable the Court to make the following findings [among
others]:  (1) a sound business reason exists for the transaction; (2) . . . the purchase price
constitutes the highest or otherwise best offer and provides fair and reasonable consideration;
[and] (3) the proposed transaction is in the best interests of the debtor's estate, its creditors, and
where relevant, its interest holders." *In re Adoption of Amended Guidelines for the Conduct of*

---

[14]     As noted below, due to the Trustee's apparent abdication of his business judgment, the Renco Parties
submit that the more stringent "entire fairness" standard should apply.  The Proposed Sale does not pass muster,
however, under either standard.

*Asset Sales* (General Order M-383) (Bankr. S.D.N.Y. Nov. 18, 2009).

60.     The Court should disallow the Proposed Sale for the simple reason that it

presumes the payment of Beus Gilbert's 41% contingency fee notwithstanding the fact that, as

explicitly provided in the Beus Gilbert Retention Order, the fees to be paid Beus Gilbert must

first be found reasonable and approved by the Court pursuant to Section 330 of the Bankruptcy

Code.  The Proposed Sale further presumes the payment of 3% of the "Gross Recoveries" on the

Judgment on account of the Trustee's Chapter 7 commissions, notwithstanding the fact that

under Section 326 of the Bankruptcy Code, the Trustee also is entitled only to such fees as

allowed by the Court, subject to a *maximum* of 3% on moneys disbursed.  There can be no

"sound business reason" for gratuitously imposing upon potential bidders the obligation to

assume payment of these "worst case" amounts, nor for relinquishing the judicial safeguards

ensuring the reasonableness of the fees paid to Beus Gilbert and the Trustee.  Nor can these

concessions be reconciled with "the best interests of the debtor's estate."

61.     The Court should proscribe the Proposed Sale for the additional reason that

instead of furthering the best interests of the Estates, and in violation of his assurances to the

Court that he would "welcome alternative structures" to the proposed transaction, the Trustee has

harmed the Estates by refusing to even consider a sale structure – like the one proposed under the

Renco Bid – that beats the Revised AEM Purchase Agreement by $18.8 million on the low end,

and by approximately $5.9 million on the high end.  In addition, Renco agreed to assume (and,

indemnify the Estates against) the Assumed Liabilities, including the EPA claims which the

Trustee has estimated to amount to "a very substantial claim . . . at least tens of millions of

dollars and possibly hundreds of millions of dollars."  July 14, 2016 Hr'g Tr. at 40:10-13.

62.     The Trustee's conduct indicates that his business judgment has been compromised

(perhaps because of his desire to earmark funds to cover his and his professionals' fees) and calls for heightened scrutiny of the Proposed Sale.  *See Pepper v. Litton*, 308 U.S. 295, 306 (1939) (finding that insider transactions in the bankruptcy context are "subjected to rigorous scrutiny"); *In re Bidermann Indus. U.S.A., Inc.*, 203 B.R. 547, 554 (Bankr. S.D.N.Y. 1997) (applying heightened scrutiny to a proposed sale that would benefit insiders); *Official Comm. of Unsecured Creditors of Enron Corp. v. Enron Corp. (In re Enron Corp.)*, 335 B.R. 22, 28 (S.D.N.Y. 2005) (transactions that benefit insiders must withstand heightened scrutiny before they can be approved under Section 363(b)); *In re Ozark Rest. Equip. Co., Inc.*, 850 F.2d 342, 345 (8th Cir. 1988) (sales arranged by insiders must be given close scrutiny).

63.    "In applying heightened scrutiny, courts are concerned with the integrity and entire fairness of the transaction at issue, typically examining whether the process and price of a proposed transaction not only appear fair but are fair and whether fiduciary duties were properly taken into consideration."  *In re Innkeepers USA Tr.*, 442 B.R. 227, 231 (Bankr. S.D.N.Y. 2010).

64.    As described in detail above, neither the process employed by the Trustee in pursuing the Proposed Sale, nor the terms thereof, are fair (or appear fair) to the Debtors' stakeholders.  The Court should disallow the Proposed Sale for this additional reason.

## CONCLUSION

WHEREFORE, for the reasons set forth above, the Renco Parties respectfully request that the Court (i) deny the Motion, (ii) disallow the Proposed Sale, (iii) order that a new auction take place, to be administered by a professional to be appointed be the Court, and (iv) grant such other and further relief in favor of the Renco Parties as the Court may deem just and proper.

Dated:   August 16, 2016
       New York, New York

KASOWITZ, BENSON, TORRES
 & FRIEDMAN LLP

By: /s/ *David M. Friedman*
David M. Friedman
Adam L. Shiff
Shai Schmidt
1633 Broadway
New York, New York 10019
Telephone:  (212) 506-1700
Facsimile:   (212) 506-1800

*Attorneys for The Renco Group, Inc.
and Ira Leon Rennert*