UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re | ) | Chapter 7 Case |
| | ) | |
| MAGNESIUM CORPORATION OF | ) | Case No. 01-14312 (REG) |
| AMERICA, et al., | ) | |
| | ) | Jointly Administered |
| Debtors. | ) | |

### TWENTY-EIGHTH INTERIM STATUS REPORT OF CHAPTER 7 TRUSTEE

Lee E. Buchwald, as chapter 7 trustee of the estates of Magnesium

Corporation of America ("MagCorp") and Renco Metals, Inc. ("Metals") (together, the

"Debtors"), as and for his twenty-eighth interim status report, respectfully represents as

follows:

### Preliminary Statement

1.      On August 2, 2001 (the "Petition Date"), MagCorp and Metals each filed a

voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors

remained in possession of their respective properties and management of their respective

businesses as debtors in possession under sections 1107 and 1108 of the Bankruptcy

Code until April 14, 2003.

2.      On March 3, 2003, the Court entered an order granting that portion of the

Motion of the Ad Hoc Committee of Senior Noteholders for the appointment of a chapter

11 trustee and directing the United States Trustee to appoint a chapter 11 trustee.  On

April 14, 2003, this Court entered an order granting the application of the United States

Trustee to appoint me as the chapter 11 trustee in these cases.  By order dated September

25, 2003, on my motion, the Debtors' cases were converted to cases under chapter 7 of

the Bankruptcy Code.  On September 25, 2003, I was appointed chapter 7 trustee of the

Debtors' estates.

**Background**

3.        Prior to my appointment, on February 28, 2002, the Debtors filed their

First Amended Joint Plan of Reorganization (the "Plan") and accompanying disclosure

statement (the "Disclosure Statement").  The Disclosure Statement was never approved

by this Court and the Plan was never confirmed.  Rather, the Debtors sought and obtained

authority to sell substantially all of their assets (the "Asset Sale") to U.S. Magnesium,

LLC ("US Mag"), an affiliate of Ira Leon Rennert ("Rennert"), Chairman and Chief

Executive Officer of Metals and The Renco Group, Inc. ("Renco Group"), a non-debtor

entity which owns Metals.  Upon information and belief, the Asset Sale was

consummated on June 24, 2002, and since that time the Debtors have had no business

operations.

4.        Since 1993, MagCorp has been a subsidiary of Metals.  Metals is a

holding company with no operations of its own.  Metals is or was a wholly owned

subsidiary of Renco Group, which is beneficially owned by Rennert, directly or through

trusts established by him for the benefit of himself or members of his family (the

"Trusts").

5.        Prior to consummation of the Asset Sale, MagCorp was engaged in the

production of magnesium extracted from the brine of the Great Salt Lake in Utah.

MagCorp's magnesium production operations were conducted at a facility in Rowley,

Utah, adjacent to the southwestern shore of the Great Salt Lake.  The Rowley facility was

the largest producer of magnesium in the United States, and one of the largest magnesium producers in the world.

6.  Upon information and belief, MagCorp's operations gave rise to substantial environmental liabilities.  In January 2001, the United States of America, acting at the request of the United States Environmental Protection Agency, commenced an action in which the United States of America is seeking injunctive relief and $900 million in civil penalties against the Debtors, Renco Group, the Trusts, Rennert, and US Mag (which was added as a defendant after consummation of the sale of the Debtors' assets) for violations occurring over a period of at least five years preceding January 2000 (the "DOJ Action").  The EPA's complaint is predicated on, *inter alia*, illegal treatment, storage and disposal of hazardous wastes.

7.  In 1996, MagCorp sold $150 million in 11 1/2 % senior notes due 2003. Upon information and belief, Rennert, Renco Group and others acting in concert with them caused more than half of the proceeds of such notes to be conveyed to Renco Group in the form of dividends and redemption of preferred stock previously issued by Metals, which was held by Renco Group.  Thereafter, the Defendants caused the Debtors to pay additional funds to insiders in the form of dividends and bonuses.  Upon information and belief, all such conveyances occurred at times when the Debtors were insolvent (or such conveyances rendered the Debtors insolvent), even without giving effect to the Debtors' potential environmental liabilities.

## Conversion to Chapter 7

8.  Upon my appointment as chapter 11 trustee, in fulfillment of my duties under section 1106 of the Bankruptcy Code, I commenced an investigation regarding the

Debtors' financial affairs.  As a result of this investigation, I determined that the Debtors

sold substantially all of their assets in June 2002 and no longer operated any businesses

or owned any real property; that the amount of cash and cash equivalents then held by the

Debtors was less than the allowed amount of unpaid chapter 11 administrative expense

claims; that substantial unliquidated administrative expense claims had been asserted;

that absent a substantial recovery in the Renco Group Litigation, it appeared that the

Debtors' estates were administratively insolvent; that it would not be feasible for the

Debtors to propose a confirmable plan in the foreseeable future; that continued

administration under chapter 11 served no purpose other than to cause the estates to

continue to incur administrative expenses that cannot be paid; and that the vital task of

prosecuting the Renco Group Litigation (defined below) could be accomplished far more

efficiently under chapter 7.  Based on the foregoing, I moved to convert the Debtors'

cases to cases under chapter 7.  After such motion was granted and I was appointed

chapter 7 trustee herein, I had the bank accounts I had been maintaining as chapter 11

trustee designated as accounts in my name as chapter 7 trustee.

## Renco Group Litigation

9.      I believe that the pre-petition conduct of Rennert, Renco Group and other

persons and entities acting in concert with them and/or with entities controlled by them

caused substantial harm to the Debtors and their creditors.  On July 31, 2003, my special

litigation counsel, Beus Gilbert PLLC ("Beus Gilbert"), commenced adversary

proceeding 03-6559 against The Renco Group, Inc., et al. (the "Renco Group

Litigation").  The claims asserted in the Renco Group Litigation include those based on,

inter alia, fraudulent conveyance, aiding and abetting fraudulent conveyance, breach of

fiduciary duty, aiding and abetting breach of fiduciary duty, negligence/professional malpractice, breach of contract, negligent misrepresentation, conspiracy, corporate waste and mismanagement, unjust enrichment, and declaration and receipt of unlawful dividends and wrongful redemption of stock in violation of Delaware law.

10.     On or about November 14, 2003, my special counsel filed an amended complaint.  In January 2004, most defendants moved to dismiss the amended complaint, and several defendants moved to withdraw the reference of the Renco Group Litigation to the District Court.  At the first pre-trial conference, the Court granted defendants' motion to limit discovery pending determination of the motions to dismiss.  I filed papers opposing both the motions to dismiss and the motions to withdraw the reference.  By decision and order dated May 20, 2004, United States District Judge Richard Conway Casey denied the motions to withdraw the reference.  Hearings on the motions to dismiss the amended complaint were conducted on November 12 and 15, 2004, at which time Judge Gerber reserved decision.

11.     By motion dated May 5, 2005, my special counsel sought Court approval of a stipulation settling all disputes with Keith Sabel and K. Sabel Holdings, Inc., two minor defendants in the Renco Group Litigation, for $75,000.  The motion was heard and granted on July 12, 2005, and the settlement was consummated soon thereafter.  At the July 12, 2005 hearing, the Court also modified its prior ruling limiting discovery to permit my counsel to depose Mr. Sabel, and to permit document production in connection therewith.  The deposition of Mr. Sabel was conducted on January 16, 2006.

12.     By motion dated February 18, 2008, I sought entry of an order, pursuant to Rules 7026 and 7030 of the Federal Rules of Bankruptcy Procedure and Rules 26 and 30

of the Federal Rules of Civil Procedure, dissolving the stay of discovery and authorizing

me to proceed with discovery in the Renco Group Litigation, including without limitation

requests for production of documents and depositions of both parties and non-parties.  All

of the defendants interposed objections.  At the hearing conducted on April 2, 2008,

Judge Gerber denied my motion to dissolve the stay of discovery, without prejudice to

renew after 90 days, because Judge Gerber believed that there was a reasonable chance

that he would issue a ruling on the motions to dismiss within such timeframe.

13.     After expiration of such 90-day period, I renewed my motion to dissolve

the stay of discovery.  At the hearing conducted on August 13, 2008, Judge Gerber (a)

advised that the claims against the four professional firm defendants were not likely to

survive the motions to dismiss, and (b) granted my motion in part, ruling that document

discovery could proceed on the claims for relief that were likely to survive the motions to

dismiss, e.g., fraudulent transfers, preferences, breach of fiduciary duty by directors and

officers, declaration of illegal dividends, wrongful redemption.  Thereafter, my special

counsel prepared and served revised requests for production of documents.

14.     By decision dated January 16, 2009, the Court dismissed all of the estates'

claims against the four professional defendants based on the doctrine of imputation under

the so-called *Wagoner* rule, but upheld most of my claims against the other defendants.

The remaining claims include fraudulent conveyance and breach of fiduciary duty claims

in excess of $100 million against former officers, directors and/or shareholders of the

Debtors.  These claims are now being prosecuted aggressively.

15.     On May 11, 2010, I filed a motion seeking authority to retain and employ

one or more consulting and testifying experts in connection with the Renco Group

Litigation without the need to disclose the identity of such experts or the nature of such engagements at this time.  The purpose of this motion was to avoid giving an unfair advantage to the Defendants, because they were free to retain experts without having to disclose any information at that time.  On June 16, 2010, the motion was granted over the opposition of the defendants in the Renco Group Litigation, and thereafter I engaged a number of experts to assist in prosecution of the Renco Group Litigation.

16.     On July 1, 2010, the Court granted in part defendants' motion to restrict the scope of discovery on environmental claims in light of a ruling in the DOJ Action dismissing certain of the environmental claims that had been brought under the Resource Conservation and Recovery Act or RCRA.  Thereafter, the 10th Circuit Court of Appeals reversed and remanded the decision of the District Court dismissing the RCRA environmental claims.  As a result, my special counsel negotiated a stipulation with defense counsel under which the scope of discovery on environmental claims will be broadened, and discovery taken in the DOJ Action may be used in the Renco Group Litigation (subject to confidentiality restrictions).

17.     Thereafter, both the District Court in the DOJ Action and the Bankruptcy Court in the Renco Group Litigation approved stipulations allowing discovery taken in the DOJ Action to be used in the Renco Group Litigation (subject to confidentiality restrictions).  In light of these developments and subsequent scheduling difficulties, the deadlines for the completion of fact discovery and expert discovery were extended several times.  In August 2011, I accompanied my experts in the Renco Group Litigation on a plant tour of MagCorp's former magnesium production facility in Rowley, Utah.

The parties began exchanging expert reports in May 2012, and thereafter conducted depositions of expert witnesses.

18.    On March 15, 2013, the parties filed motions for summary judgment and related pleadings, and Defendants filed motions to preclude the testimony of two of my experts.  On May 6, 2013, the parties filed responses to each other's motions.  Reply papers were filed June 7, 2013.  Oral argument on the motions for summary judgment and related motions to preclude testimony was conducted on July 24, 2013.

19.    At the conclusion of the July 24, 2013 hearing, the Bankruptcy Court issued its ruling denying the Defendants' motions to preclude the testimony of two of my experts.  At a further hearing conducted on July 30, 2013, the Bankruptcy Court issued its ruling: (a) granting Defendants' motion for summary judgment in part to the extent of dismissing in their entirety my claims for negligent misrepresentation set forth in Counts 28 and 36 of the Trustee's Amended Complaint, and otherwise denying Defendants' motion for summary judgment in all respects; and (b) granting the Trustee's motion for partial summary judgment.  I do not believe that the dismissal of my claims for negligent misrepresentation will have any effect on the merits of my litigation claims against the Defendants.  On August 26, 2013, the Bankruptcy Court entered an order memorializing the foregoing relief.

20.    On September 9, 2013, in what appeared to be an act of desperation to try to delay their day of reckoning, the Defendants filed a motion for leave to appeal from entry of the order denying their three motions.  My opposition papers were filed on September 23, 2013, and Defendants filed their reply papers on October 3, 2013.  The motion for leave to appeal was argued before District Judge Paul A. Engelmayer on

November 6, 2013. Judge Engelmayer found that the Defendants had failed to satisfy any of the three prongs necessary to justify the granting of an interlocutory appeal, and therefore he denied the motion from the bench.

21.    Separately, because the Defendants would not consent to a jury trial being conducted before the Bankruptcy Court, on November 5, 2013 my special litigation counsel filed a motion to withdraw the reference with respect to the Renco Group Litigation to the District Court. On December 11, 2013, the motion to withdraw the reference was granted without opposition by District Judge Robert W. Sweet. Thereafter, the Renco Group Litigation was assigned to District Judge Alison J. Nathan.

22.    Since the time that the Bankruptcy Court ruled on the summary judgment and expert preclusion motions, my special counsel had been preparing this case for trial, a job made more arduous and time-consuming as a result of the Defendants' repeated stall tactics. For instance, in June 2014, the Defendants made another round of motions to preclude the testimony of two of my experts and also filed a motion for a protective order to bar me from calling the Defendants as witnesses in my case. Just as Judge Gerber had done, Judge Nathan denied the expert preclusion motions. She also denied the motion for a protective order.

23.    On August 29, 2014, after months of hard work, the Joint Final Trial Report was filed with the Court. In September 2014, the Defendants filed eleven motions *in limine* and my special counsel filed seven motions *in limine*. On November 7, 2014, two lawyers from Park Jensen Bennett LLP filed appearances in the Renco Group Litigation. Park Jensen Bennett LLP served as co-counsel with Kaye Scholer through the trial in this matter.

24.      On November 12, 2014, in yet another brazen stall tactic, Defendants' new lawyers filed a letter requesting expedited briefing and hearing on motions: (1) seeking to limit my right to a jury trial (they wanted fraudulent transfer, preference and unlawful dividend claims tried to the Court and not to the jury); (2) belatedly raising statute of limitations and statute of repose issues under Utah law (essentially asking for permission to file a motion for partial summary judgment on limitations and repose issues); and (3) attempting to raise as a new affirmative defense that the stock redemption and dividend payments were "settlement payments" protected by the safe harbor under section 546(e) of the Bankruptcy Code.  The Defendants apologized for raising these issues so belatedly, but argued that the case is "complicated."

25.      My special counsel replied by letter dated November 14, 2014, pointing out that Defendants' requests were woefully untimely and lack any merit.  At a hearing held on December 19, 2014, the District Court denied all three motions that Defendants' new counsel had made, and ruled on most of the motions *in limine.*  The rest of the motions *in limine* were decided by the time of trial.

26.      On January 16, 2015, the parties attended a court-ordered mediation before Magistrate Andrew Peck.  The Defendants had no interest in offering anything other than a pittance, and so the mediation concluded unsuccessfully.  Thereafter, my litigation team and I continued preparing for trial.

27.      On January 23, 2015, Renco Group (through yet another set of lawyers, Dickstein Shapiro LLP) filed a motion in the Bankruptcy Court for leave to object to the claims of certain creditors of Renco Metals (the "Claims Motion").  On February 4, 2015, I filed a response in opposition to the Claims Motion, pointing out that Renco Group had

an ulterior motive, *i.e.*, Renco Group was seeking to disallow claims against Renco Metals in a fruitless attempt to deprive me of a triggering creditor under section 544(b) of the Bankruptcy Code, which allows a trustee to avoid any transfer that is voidable under applicable non-bankruptcy law by a creditor holding an unsecured claim. I relied on section 544(b) of the Bankruptcy Code and applicable New York law to avoid as fraudulent conveyances the dividends and other payments at issue in the Renco Group Litigation (although I also sought damages under other legal theories that were not dependent on section 544, such as breach of fiduciary duty and unjust enrichment). At a hearing conducted on February 10, 2015, Judge Gerber agreed with me and denied the Claims Motion. An order to that effect was entered on February 19, 2015.

28.    The jury trial commenced on February 2, 2015 and concluded on February 27, 2015, at which time the jury returned a verdict in my favor in the aggregate amount of $118,220,000, consisting of (a) an award of damages against Renco Group in the amount of $101,000,000, (b) an award of damages against Ira Rennert and the trustees of trusts established by Ira Rennert (the "Rennert Trusts"), jointly and severally, in the amount of $16,220,000, and (c) and an additional award of $1,000,000 in punitive damages against Renco Group. The jury did not impose any liability on the other Defendants. The jury verdict in the aggregate amount of $118,220,000 represents nearly 99% of the $118,445,675 that I sought to recover in the Renco Group Litigation.

29.    Thereafter, at the request of District Judge Alison J. Nathan, the parties briefed the issues concerning prejudgment interest - the appropriate rate and from what date interest should accrue. On March 16, 2015, the District Court issued its Memorandum & Order determining that prejudgment interest would be applied at the rate

of 6% per annum, not compounded, and commencing on August 2, 2001 (*i.e.*, the Petition

Date). Thereafter, on March 20, 2015, yet another set of new lawyers, Orrick, Herrington

& Sutcliffe LLP, filed an appearance on behalf of Defendants.

30.   On March 23, 2015, after calculating interest on the jury awards, the Clerk

entered judgment in the aggregate amount of $214,199,093.70 in my favor, as follows:

(a) against Renco Group in the amount of $184,698,246.58, and (b) against Ira Rennert

and the Rennert Trusts, jointly and severally, in the amount of $29,500,847.12.

*Buchwald v. The Renco Group, Inc., et al.*, 13-cv-07948-AJN, Docket No. 389.

Postjudgment interest shall apply at the applicable rate under 28 U.S.C. § 1961.

31.   On April 2, 2015, Judge Nathan approved a stipulation imposing a stay of

execution on the judgment until 30 days after disposition of Defendants' upcoming post-

trial motion under Federal Rules of Civil Procedure 50 and 59, subject to Defendants'

posting of a supersedeas bond in an amount in excess of $237 million. On April 2, 2015,

Defendants posted a supersedeas bond in the amount of $237,762,000.

32.   On April 20, 2015, Renco Group, Ira Rennert and the Rennert Trusts (the

three Defendants against whom judgment was entered) filed a motion under Rules 50 and

59 of the Federal Rules of Civil Procedure asking the District Court to enter judgment as

a matter of law, or in the alternative to order a new trial. The Defendants first argue,

*inter alia*, that (a) I failed to present sufficient evidence of solvency to support the

verdict, arguing for at least the fourth time that the testimony of my insolvency expert

should be precluded under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579

(1993), (b) the unjust enrichment and fraudulent conveyance claims fail against Rennert

as a matter of law, and (c) punitive damages should be struck as a matter of law; and

then, in the alternative, that a new trial should be ordered, *inter alia*, because (a) the

evidence of environmental contamination at the Debtors' Rowley facility was highly

prejudicial, and (b) the jury reached an improper compromise verdict. The Defendants

against whom judgment was not entered also filed a motion requesting that, if a new trial

is ordered, then they should not have to defend again the claims I made against them in

the first trial.

33.     Also on April 20, 2015, Beus Gilbert filed a motion under Rule 59 to

amend the judgment, requesting that the rate of prejudgment interest be increased from

6% to the 9% annual rate provided by New York State law, and that interest be calculated

from July 2, 2000, the last date the Debtors had paid interest on the 1996 Notes.

Opposition papers were filed by the parties to the three sets of post-trial motions on

May 7, 2015. Reply papers were filed May 18, 2015.

34.     By decision and order entered on August 20, 2015 [Docket No. 423],

Judge Nathan ruled on the parties' post-trial motions, as follows: (a) the motion by

Defendants Renco Group, Ira Rennert and the Trustees of the Rennert Trust for judgment

as a matter of law was granted in part, but only with respect to my claims for unjust

enrichment and punitive damages, and denied in all other respects; (b) the same

Defendants' motion for a new trial was denied; (c) the remaining Defendants' motion for

judgment as a matter of law was denied as moot; and (d) my motion to alter or amend the

judgment to increase the amount of prejudgment interest was denied. Judge Nathan

requested that the Clerk amend the judgment accordingly. Defendants filed a Notice of

Appeal on August 20, 2015.

35.     The Clerk entered an amended judgment on August 24, 2015 [Docket No. 423] (the "Amended Judgment").  The bottom line was that I kept all of my claims from the original judgment except for the $16.22 million claim against the Trustees of the Rennert Trust (for which Ira Rennert is still liable under two theories of recovery) and the $1 million punitive damages award.  The judgment remained the same in all other respects, *i.e.*, against Renco Group in the amount of $183,698,246.58 (plus post-judgment interest) and against Ira Rennert in the amount of $29,500,847.12 (plus post-judgment interest), for an aggregate recovery in the amount of $213,199,093.70 (plus post-judgment interest).

36.     On September 16, 2015, I filed a Notice of Cross-Appeal with respect to issues concerning prejudgment interest.

37.     On September 18, 2015, the District Court approved a stipulation staying me from executing or otherwise enforcing the Amended Judgment until the Second Circuit issues its mandate in the case, provided that the amended bond shall remain in full force and effect.

38.     On September 23, 2015, the Defendants against whom judgment was not entered filed a Notice of Appeal with respect to their request to be excused from a new trial in the event one is ordered.

39.     On September 23, 2015, a technical amendment was made to the Amended Judgment, and thereafter the parties filed amended Notices of Appeal and Cross-Appeal with respect thereto.

40.     By application dated September 16, 2015, the Trustee sought this Court's authorization, pursuant to Section 327(a) of the Bankruptcy Code and Fed. R. Bankr. P

2014(a), to retain Kellogg Huber Hansen Todd Evans & Figel PLLC ("KHHTEFF") as special appellate counsel. By order dated September 29, 2015, this Court granted the application to retain KHHTEFF as special appellate counsel. KHHTEF's compensation for its services is on a sliding scale fixed fee basis, but contingent upon obtaining a successful result (including a settlement) and its fees are payable only out of recoveries. If the Amended Judgment is affirmed by the appellate court with a reduction of more than 30% of the monetary damages awarded under the Amended Judgment, or if the Amended Judgment is reversed, or if the case is remanded in a manner that would require a new trial of the merits of the claim, then no fee will be due to KHHTEF for services rendered.

41.     On December 3, 2015, Defendants filed their opening appellate brief raising three issues: (1) whether the jury reached an impermissible compromise verdict; (2) whether the District Court prohibited Defendants from presenting highly probative evidence demonstrating that the Trustee's allegations of environmental liability were overblown; and (3) whether the Trustee had the right to a jury trial on his claims.

42.     On March 3, 2016, I filed my response thereto and the opening brief on my Cross-Appeal on whether I was entitled to prejudgment interest under Delaware law that exceeds such interest under New York law. On May 2, 2016, Defendants filed their combined brief replying to my response and responding to my Cross-Appeal. My reply was filed on May 16, 2016. The matter is fully briefed, and I expect oral argument to be conducted early next year.

43.     Throughout this process, I have continued to supervise litigation strategy and have overseen developments in the Renco Group Litigation.

### Sale of Interest in Litigation Proceeds

44.    As of my last report, I only had about $670,000 in the bank and no other assets, but for the $213 million Amended Judgment (currently on appeal) against Ira Rennert and Renco Group.  Creditors are owed over $200 million and had no chance of any recovery other than from the Amended Judgment.  I was concerned with the risk that the Amended Judgment might be reversed on appeal, and that I would not have sufficient resources to continue litigating against well-funded adversaries.  I also wanted to be sure that long-suffering creditors would receive recoveries regardless of the outcome of the appeal.

45.    Therefore, in March 2016, I conceived the idea of reaching out to litigation funders to monetize a portion of this significant but speculative asset.  I asked my counsel Stevens & Lee ("S&L") to assist me in this endeavor.  I researched and investigated various litigation funders and asked S&L to prepare and send a tickler to each of them.

46.    S&L structured a sale of an interest in net recoveries from the proceeds of the Renco Group Litigation, and assisted me in running a private sale process, negotiating with multiple litigation funders and ultimately negotiating a stalking horse bid.  On June 23, 2016, S&L filed a motion for approval of the stalking horse bid (subject to better bids), and assisted me in running a public auction process after approval of the bid procedures.  As a result of the public auction, the net economic benefit to the estates was improved by nearly $5 million, *i.e.*, the consideration received by the estates was increased from $25 million to $26.2 million, while the consideration that may be payable by the estates was reduced from $53,750,000 to $50,000,000.  I evaluated the competing

bids that were submitted in both the private sale process and the public auction, and participated in negotiations.

47.     After two hotly contested hearings in this Court and one in the District Court, I obtained Court approval of an agreement whereby I sold an interest in the potential litigation recoveries to an affiliate of the largest litigation funder in the world, Gerchen Keller, for $26.2 million.  This enabled me to monetize a portion of this speculative asset, hedge the estates' downside exposure, provide much needed liquidity to the Debtors, and guarantee that there will be money for creditors.  As reported in the *American Lawyer* and other media outlets, no transaction like this has ever been done in a pending bankruptcy case.

48.     The Renco Group and Ira Rennert, and an *ad hoc* consortium of noteholders (the "Noteholder Consortium"), each took separate appeals from the sale order.  I was successful in overcoming a motion by the Noteholder Consortium for a stay pending their appeal of the sale order.  In connection with each of the three hearings held on this matter, I submitted detailed declarations in support thereof and I also testified at the bid procedures hearing.  The sale closed on September 8, 2016, and I received $26.2 million ("Sale Proceeds") at closing.  Thereafter, I filed a motion in the District Court to dismiss the appeals as moot.[1]

## Preference Actions

49.     After conversion to chapter 7, I directed my professionals to investigate potential avoidance actions against third parties.  This effort was hindered by the Debtors' former principals' lack of cooperation in turning over books and records, and so

---

[1] The Noteholder Consortium subsequently withdrew its appeal consensually, but Rennert and Renco Group are still prosecuting their appeal.

I had to subpoena records from the Debtors' pre-petition banks. In March 2004, I commenced over 150 actions to avoid preferential transfers (the "Preference Actions").[2] The Preference Actions are identified in Exhibit A to the interim report I filed on May 13, 2004.[3] On March 22, 2004, the Bankruptcy Court entered an Order Establishing Procedures Governing All Adversary Proceedings Brought Pursuant To 11 U.S.C. Sections 544, 547, 548 And 550 (the "Procedures Order"), which provides, *inter alia,* "that, with respect to the settlement of any Avoidance Action (whether or not an adversary proceeding has been commenced), the Trustee shall be authorized to consummate the proposed settlement without order of the Court or consent of any other party."

50.     By 2007, I had consummated settlements of over 120 Preference Actions for aggregate cash consideration of approximately $2.4 million, and had been filing regular reports with respect thereto, pursuant to the terms of the Procedures Order. I dismissed some Preference Actions after the respective defendants were able to provide documents establishing complete defenses. I also obtained default judgments against a number of defendants. To spare expense, I engaged C&W Consultants to pursue all default judgments where my counsel was not in active negotiations. C&W Consultants were able to collect approximately $73,000 (net of fees of C&W Consultants) from ten different judgment debtors.

51.     By 2007, all Preference Actions have been resolved except for the most hotly contested preference action, Adversary Proceeding No. 04-02656 against Williams Energy Marketing & Trading Co., f/k/a Barrett Resources ("Williams"), where the

---

[2] One additional Preference Action was commenced in June 2004. Each Preference Action also seeks to avoid the transfers at issue as constructive fraudulent conveyances, usually as a precautionary measure.
[3] In addition, I resolved three preference claims without having to file a complaint.

amount in controversy exceeded $3 million. I participated in eight depositions (including my own deposition and the depositions of three experts). I oversaw negotiations between my counsel and counsel to Williams. When such negotiations failed to bear fruit, I authorized my counsel to file a motion for summary judgment, and to respond to the motion for summary judgment filed by Williams. Under a summary judgment motion, the moving party asserts that there are no disputed issues of material fact and so judgment can be granted in movant's favor as a matter of law. These motions address the principal defenses raised by Williams, *viz.*, the forward contract safe harbor under section 546(e), the ordinary course of business and subsequent new value, and involve complex issues. I attended oral argument on the cross-motions, which was conducted on June 5, 2007, at which time the Court reserved decision. In November 2009, the parties filed supplemental briefs on the decision of the United States Court of Appeals for the Fourth Circuit in *Hutson v. E.I. du Point de Nemours and Company (In re National Gas Distributors, LLC)*, 2009 WL 325436 (4th Cir. 2009), which addressed the section 546(e) forward contract defense.

52.    Unfortunately, after the action against Williams was commenced, the case law on the section 546(e) forward contract safe harbor continued to evolve in a manner prejudicial to the estate, *i.e.*, nearly all courts construed the defense broadly. By decision and order dated October 17, 2011 (the "Williams Decision"), the Court determined that there were disputed issues of material fact on both the section 546(e) forward contract safe harbor and the ordinary course of business defense. Therefore, the Court held that judgment could not be granted in either party's favor as a matter of law, and denied the summary judgment motions filed by both parties. Thereafter, the parties agreed to try to

resolve their differences through mediation.  A mediation session was conducted on

March 15, 2012, and was adjourned without date while the parties continued to evaluate

their respective positions.  Thereafter, in October 2012, I settled the Williams action for a

cash payment of $125,000 and a waiver of all claims.  Based on the strength of the

section 546(e) forward contract defense and the Williams Decision, I believe that

represented the best result achievable.  Thus, all Preference Actions have been resolved.

## **Other Developments**

53.     On May 27, 2016, Renco Group commenced an adversary proceeding (the

"Renco Adversary Proceeding") against the indenture trustee seeking to prevent the

indenture trustee and noteholders from recovering on their claims because the

noteholders allegedly ratified the payment of Renco Group's dividends through their

participation in a note offering that was expressly initiated and consummated to fund one

of those dividends (and authorized the others).  Renco Group asserts that the claims of

noteholders should be disallowed under principles of equitable disallowance, quasi

estoppel, unjust enrichment and under Section 502(d) of the Bankruptcy Code.

54.     I believe the Renco Adversary Proceeding is wholly without merit, and I

have provided information to the indenture trustee and the noteholders to assist in their

defense, and monitored this proceeding.  Among other things, the Renco Adversary

Proceeding completely ignores the fact that the note offering was predicated on false

financial disclosure, including unsustainable projections, and the failure to disclose

significant environmental liabilities and material setbacks with respect to MagCorp's

operating processes.  Because I am not a party in the Renco Adversary Proceeding, I

believe it would be inappropriate take an active role therein to assist the noteholders

because that would be unfair to other creditors who have no financial stake in the outcome of the Renco Adversary Proceeding. On September 29, 2016, Wilmington Trust, as indenture trustee, filed a motion to dismiss the complaint, which is scheduled to be heard on December 1, 2016.

55.    I asked KHHTEF to provide additional services beyond the scope of its initial retention in order to assist me in marketing the Renco Litigation Interest, and in June 2016 I agreed that, if a sale was consummated, I would promptly seek *nunc pro tunc* authority to expand the terms of KHHTEF's retention to include its time spent thereon. On September 20, 2016, I filed an application to expand the retention of KHHTEFF to include the following services to be compensated on an hourly basis: (a) representation of me in connection with a petition for rehearing *en banc* before the United States Court of Appeals for the Second Circuit, a petition for *certiorari* to the United States Supreme Court, or further proceedings in the United States District Court for the Southern District of New York, and (b) time spent by KHHTEF concerning the sale of the Renco Litigation Interest. Such application was granted by order dated October 13, 2016.

56.    Thereafter, in October 2016, S&L and KHHTEF filed interim fee applications, and my former counsel, Salomon Green & Ostrow, P.C., filed a final fee application. The foregoing fee applications will be heard by the Court on November 22, 2016.

### Principal Assets and Liabilities, Collections, Disbursements

57.    The principal assets of the Debtors' estates are (a) the claims raised in the Renco Group Litigation, which after years of hard work resulted in a judgment in my favor in excess of $213 million, and (b) cash in the amount of $26,843,279.37, consisting

primarily of the $26.2 million in Sale Proceeds. The Defendants are well-funded, have

been defending the action vigorously and are now pursuing an appeal. Therefore, more

effort will have to be expended by me and my professionals before the Amended

Judgment can be converted into cash for distribution to creditors.

58.    For several years prior to September 2016, rather than earning interest on

bank accounts, the Debtors had to pay fees. In August 2016, recognizing that I would

soon have over $26 million which would give me leverage in negotiations, I began

discussions with providers of bankruptcy trustee software and services to obtain a better

deal for the estates. As a result thereof, in September 2016, I reached an arrangement

whereby the Debtors are now earning interest on their bank accounts, rather than paying

fees.

59.    On September 15, 2016, I switched all estate bank accounts from Empire

National Bank to Rabobank. As of October 31, 2016, MagCorp had $26,840,317.84 on

deposit in an interest-bearing account at Rabobank. As of October 31, 2016, Metals had

$2,961.53 on deposit in an interest-bearing account at Rabobank.

60.    My last report covered the six-month period through April 30, 2016.

Between May 1, 2016 and October 31, 2016, on behalf of MagCorp, I collected

$26,210,365.37 (consisting primarily of the $26.2 million in Sale Proceeds) and I

disbursed $36,433.81. Between May 1, 2016 and October 31, 2016, on behalf of Metals,

I collected $1.14, and I disbursed $60.00.

61.    Since my appointment as chapter 7 trustee herein, on behalf of MagCorp, I

have collected $28,632,532.48 and disbursed $1,792,214.64. Since my appointment as

chapter 7 trustee herein, on behalf of Metals, I have collected $4,418.50 and disbursed

$1,456.97.  Since my appointment as chapter 7 trustee herein, I have paid an aggregate of $1,545,835.59 on account of fees and expenses to estate professionals.

62.    The Debtors' principal liabilities consist of the claims of the note holders in the principal amount of $150 million and the environmental liabilities in an amount to be determined, which I believe will be quite substantial.  The Claims Register reflects over 850 claims in an aggregate amount exceeding $670 million.  This amount includes two claims filed by State Street Bank & Trust, as indenture trustee for the Senior Noteholders,[4] both in the amount of $169,572,520.83, and multiple claims filed by the PBGC.  Trade creditors were scheduled in the amount of approximately $5 million.

## Case Status

63.    In previous reports I advised that, until the $213 million Amended Judgment is settled or satisfied, it did not appear that I would be in a position to make distributions to creditors.  In light of my receipt of the $26.2 million in Sale Proceeds, that is no longer the case.  I now expect that, regardless of the disposition of the appeals and any further proceedings in connection with the Renco Group Litigation, there will be

---

[4] Wilmington Trust recently became successor indenture trustee.

funds available for distribution to creditors.  Therefore, soon after the sale closed, I

instructed S&L to file a motion for entry of an order setting a bar date and to begin the

claims analysis and reconciliation process.

Dated: New York, New York
       November 4, 2016


                                    s/ Lee E. Buchwald
                                    Lee E. Buchwald, Trustee

TO:  UNITED STATES TRUSTEE
     201 Varick Street, Room 1006
     New York, NY 10014
     Attn: William K. Harrington, Esq.