**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>MAGNESIUM CORPORATION OF AMERICA, *et al.*,<br><br>　　　　　　　　Debtors. | Chapter 7<br><br>Case No. 01-14312 (MKV)<br><br>(Jointly Administered) |

## DECLARATION OF LEO R. BEUS

I, Leo R. Beus, declare:

1.　　I am attorney at law, admitted to practice in the State of Arizona. I submit this declaration in support of the final application of Beus Gilbert PLLC ("Beus Gilbert") for allowance of compensation, filed contemporaneously herewith. I have personal knowledge of the facts set forth herein and, if called as a witness, could and would testify competently to the following.

**I.　　EXPERIENCE IN BANKRUPTCY CASES**

2.　　I was first admitted to practice in 1971, and have been continuously practicing law for 46 years. I am the senior member of Beus Gilbert, located in Phoenix, Arizona.

3.　　During my many years as a practicing attorney, I have represented numerous bankruptcy trustees in adversary proceedings, including in the following cases:

- Bonneville-Pacific (Utah)
- Boston Chicken, Inc. (Arizona)
- Crown Paper (California)
- Farmland Dairies (New York)
- Flooring America (Georgia)
- Keller Financial (Florida)

- Parmalat (New York)
- Roadmaster, LLC (Georgia)
- SPhinX (part of Refco bankruptcy) (New York)
- United Companies (Louisiana)
- Vesta (Alabama, Texas)

4. In these cases, Beus Gilbert obtained settlements and/or judgments totaling more than $1 billion for the debtors' respective estates.

5. In every case in which Beus Gilbert represented bankruptcy trustees, I have always insisted that the firm's fee arrangement with the trustee be approved before Beus Gilbert undertakes the litigation. My practice has been that if I do not obtain prior bankruptcy court approval of Beus Gilbert's representation—and the approval of our fee arrangement with the trustee—I will not undertake the representation.

6. Invariably, these cases involved a lengthy representation, with complex legal and factual issues and extreme risk for the firm. These cases have typically involved hotly contested legal and factual issues, extensive motion practice, millions of pages of documents, extensive discovery involving dozens of depositions and, in some cases, over a dozen experts. The defendants have been large law firms, accounting firms, investment banks, corporations, and directors and officers. They have always been represented by national, prestigious law firms. And, prestigious law firms represented the defendants in the litigation for which Beus Gilbert was employed herein.

II. **BEUS GILBERT'S RETENTION**

7. These cases were originally commenced as voluntary chapter 11 cases on August 2, 2001.

8. I was first approached to serve as litigation counsel in September 2002 by Citadel Investment Group, a senior noteholder.

9. Lee E. Buchwald was appointed chapter 11 trustee for the Debtors' estates by order, entered April 14, 2003, and was subsequently appointed chapter 7 trustee by order, entered September 24, 2003 (the "Trustee").

10. On his appointment, I immediately began discussions with the Trustee and his bankruptcy counsel, Nicholas F. Kajon, regarding the terms under which Beus Gilbert would consider undertaking the representation.

11. From the outset, I knew this would be a difficult undertaking for the firm. First, two national law firms—Willkie, Farr & Gallagher LLP and Chapman & Cutler LLP, representing an ad hoc noteholder group and the Creditors' Committee, respectively—concluded that there did not appear to be a substantial likelihood viable claims existed against the Debtors' parent, The Renco Group, Inc. ("Renco Group"), or its affiliates. Second, Judge Robert E. Gerber, then presiding over the Debtors' chapter 11 cases, expressed grave reservations about the litigation, stating in open court that the action was not "by any means [a] slam dunk," and that he would "almost certainly not approve any legal fees for either litigating or even investigating those claims, unless they are on a contingent fee basis."

12. Nevertheless, despite the conclusions of Willkie Farr and Chapman & Cutler, as well as the reservations of Judge Gerber, I decided to undertake the representation. In undertaking this representation, I was also well aware the Trustee had not been successful in securing the agreement of any other firm to pursue this litigation, which he acknowledged in his application to employ Beus Gilbert.

13. During the summer of 2003, the Trustee and I made significant efforts to secure everyone's approval of his retention of Beus Gilbert on a contingency fee basis. We had no difficulty in securing the agreement of the ad hoc noteholder group, by value, the largest creditor group, and the Beus Gilbert retention application acknowledged their support of the engagement.

14. Securing the approval of the United States Trustee was more difficult. We first contacted that office in June 2003, at which time we presented our standard Legal Representation Agreement ("LRA") for consideration. The United States Trustee required several changes.

15. Although we were able to accommodate the United States Trustee with respect to the vast majority of the proposed changes, the United States Trustee was absolutely inflexible on one point that posed a problem for me: not only must Beus Gilbert pay all costs and expenses incurred in prosecuting the litigation (these would be substantial, exceeding $2.1 million), but we must also remove our standard provision that, if we were successful in the litigation, interest must be paid on unpaid balances for costs and expenses, even though we agreed that if there was no recovery, expenses need not be paid by the estates. This last point represented a big problem for me because it resulted in Beus Gilbert not only funding the litigation over the course of many years, but also advancing all the expenses and costs incurred in prosecuting the case, without interest.

16. This last point proved such a significant issue that I personally met with Carolyn S. Schwartz, then the United States Trustee in this district. Ms. Schwartz was adamant: she would not agree to the Trustee's retention of Beus Gilbert unless the LRA's provision for the payment of interest on unpaid costs was removed. But, Ms. Schwartz volunteered an alternative—the United States Trustee's Office would approve the retention if Beus Gilbert removed the interest provision and instead *increased* its contingency fee percentages upon

4

settlement (33-1/3%) or verdict/judgment (40%) by one percentage point. Although this change obviously shifted additional risk to Beus Gilbert, I agreed.

17. On July 11, 2003, Beus Gilbert sent the United States Trustee's Office a revised LRA which reflected that important change. The other changes demanded were so numerous that, rather than submit a redlined version of the LRA to the United States Trustee, we prepared an entirely new version that incorporated the many changes required by it. (July 11, 2003 Letter to Brian Masumoto, annexed hereto as Exhibit 1.)

18. Eventually, when Beus Gilbert's retention under the revised LRA was approved in October 2003, the Trustee's counsel was able to report to the Court that "Mr. Masumoto has advised that the United States Trustee has no objection to the form of the order" retaining Beus Gilbert. (October 30, 2003 Letter to Judge Gerber, annexed hereto as Exhibit 2.)

19. Although the Trustee had now secured the approval of the ad hoc noteholder group and the United States Trustee of the terms of Beus Gilbert's LRA, I nevertheless anticipated objections from the Renco Group, which was expected, as it was a litigation target.

20. Meanwhile, the Trustee was facing a critical deadline—the running of the statute of limitations under Bankruptcy Code section 546. Therefore, even though Beus Gilbert had not yet been retained, on July 31, 2003, on behalf of the Trustee, Beus Gilbert filed its adversary complaint in the Bankruptcy Court, naming as defendants, Renco Group, certain of its affiliates, and various individuals and professional firms previously retained by the Debtors. Despite filing this complaint (to prevent the claims from being time-barred) I made clear to the Trustee—and it was stated in the LRA (§ 3.1)—that should the Bankruptcy Court not approve the LRA in accordance with its terms and provisions, Beus Gilbert reserved the right to withdraw from the litigation.

21.     On September 3, 2003, the Trustee filed his application to retain Beus Gilbert, on terms set forth in the LRA, which was annexed to the application as an exhibit. The application also specified the exact percentages which would be paid to Beus Gilbert in the event of a recovery, and further specified that it was seeking approval of compensation terms under Bankruptcy Code section 328(a).

22.     Judge Gerber approved Beus Gilbert's retention, over the objection of Renco Group, and entered an order approving the retention on October 31, 2003, following a hearing held four days prior.

### III.    THE PRIOR INTERIM FEE APPLICATION

23.     In 2005, the Trustee negotiated a settlement with two defendants in the adversary proceeding, Keith Sabel and K. Sabel Holdings, Inc., for a total of $75,000. The settlement was approved pursuant to Rule 9019, by order, entered July 18, 2005.

24.     On February 16, 2006, Beus Gilbert applied for an interim fee award of $25,749.75, or 34-1/3% of any settlement reached after 90 days following the date of the LRA, pursuant to the terms of the agreement, which was annexed to the application.

25.     No party objected to Beus Gilbert's interim fee application, or its right to compensation in accordance with the terms of the LRA, and an order granting Beus Gilbert the requested interim fee award was entered on May 12, 2006.

### IV.    ADMINISTRATIVE MATTERS

26.     Typically, it is Beus Gilbert's practice not to prepare detailed monthly billing statements in cases undertaken on a contingency fee basis. However, in this case, each Beus Gilbert attorney and employee who worked in the case recorded their time and submitted it to the firm's accounting department at the end of every month. Those time records, which are annexed

to the accompanying final fee application as Exhibit 4, and are summarized in the summary sheet preceding the application, reflect that from September 2002—when Beus Gilbert commenced working on the action—through July 2017, Beus Gilbert employees expended approximately 55,000 hours on the action, and that the total value of Beus Gilbert's services, calculated on an hourly rate basis, was approximately $14.9 million.

    I declare under penalty of perjury that the foregoing is true and correct.

Executed on December 13, 2017.

                                            /s/ Leo R. Beus