UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re | ) | |
| | ) | Chapter 7 Case |
| MAGNESIUM CORPORATION OF | ) | |
| AMERICA, et al., | ) | Case No. 01-14312 (MKV) |
| | ) | |
| Debtors | ) | Jointly Administered |
| | ) | |

## THIRTY-FOURTH INTERIM STATUS REPORT OF CHAPTER 7 TRUSTEE

Lee E. Buchwald, as chapter 7 trustee of the estates of Magnesium Corporation of America ("MagCorp") and Renco Metals, Inc. ("Metals") (together, the "Debtors"), as and for his thirty-fourth interim status report, respectfully represents as follows:

### Preliminary Statement

1.  On August 2, 2001 (the "Petition Date"), MagCorp and Metals each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors remained in possession of their respective properties and management of their respective businesses as debtors in possession under sections 1107 and 1108 of the Bankruptcy Code until April 14, 2003.  The case was initially assigned to U.S. Bankruptcy Judge Robert E. Gerber, but upon his retirement from the bench in 2016, the case was reassigned to U.S. Bankruptcy Judge Mary Kay Vyskocil.

2.  On March 3, 2003, the Court entered an order granting that portion of the Motion of the Ad Hoc Committee of Senior Noteholders for the appointment of a chapter 11 trustee and directing the United States Trustee to appoint a chapter 11 trustee.  On April 14, 2003, this Court entered an order granting the application of the United States Trustee to appoint me as the chapter 11 trustee in these cases.  By order dated September 25, 2003, on my motion, the Debtors' cases were converted to cases under chapter 7 of the Bankruptcy Code.  On September 25, 2003, I was appointed chapter 7 trustee of the Debtors' estates.

## **Background**

3. Prior to my appointment, on February 28, 2002, the Debtors filed their First Amended Joint Plan of Reorganization (the "Plan") and accompanying disclosure statement (the "Disclosure Statement"). The Disclosure Statement was never approved by this Court and the Plan was never confirmed. Rather, the Debtors sought and obtained authority to sell substantially all of their assets (the "Asset Sale") to U.S. Magnesium, LLC ("US Mag"), an affiliate of Ira Leon Rennert ("Rennert"), Chairman and Chief Executive Officer of Metals and The Renco Group, Inc. ("Renco Group"), a non-debtor entity which owns Metals. Upon information and belief, the Asset Sale was consummated on June 24, 2002, and since that time the Debtors have had no business operations.

4. Since 1993, MagCorp has been a subsidiary of Metals. Metals is a holding company with no operations of its own. Metals is or was a wholly owned subsidiary of Renco Group, which is beneficially owned by Rennert, directly or through trusts established by him for the benefit of himself or members of his family (the "Trusts").

5. Prior to consummation of the Asset Sale, MagCorp was engaged in the production of magnesium extracted from the brine of the Great Salt Lake in Utah. MagCorp's magnesium production operations were conducted at a facility in Rowley, Utah ("Rowley Facility"), adjacent to the southwestern shore of the Great Salt Lake. The Rowley Facility comprised approximately 4,525 acres, and was the largest producer of magnesium in the United States, and one of the largest magnesium producers in the world.

6. Upon information and belief, MagCorp's operations gave rise to substantial environmental liabilities. On January 16, 2001, the United States of America, acting at the request of the United States Environmental Protection Agency ("EPA"), filed suit in the United States District Court in Utah, *United States v. Magnesium Corporation of America, Inc. et al.*,

case number 2:01 CV 040, seeking injunctive relief and civil penalties for various alleged

violations of environmental laws and regulations occurring over a period of at least five years

preceding January 2000, as well as $900 million in civil penalties, against the Debtors, Renco

Group, the Trusts, Rennert, and US Mag (which was added as a defendant after consummation of

the sale of the Debtors' assets).  The EPA's complaint is predicated on, *inter alia*, illegal

treatment, storage and disposal of hazardous wastes.

7.  In July 1996, Metals sold $150 million in 11-½% senior notes due 2003 ("Senior

Notes").  The Senior Notes were guaranteed by MagCorp.  Rennert, Renco Group and others

acting in concert with them caused more than half of the proceeds of such notes to be conveyed

to Renco Group in the form of dividends and redemption of preferred stock previously issued by

Metals, which was held by Renco Group.  Such conveyances rendered the Debtors insolvent,

even without giving effect to the Debtors' potential environmental liabilities.  Thereafter,

Rennert and Renco Group caused the Debtors to pay additional funds to insiders in the form of

dividends and bonuses while the Debtors were insolvent.

### Conversion to Chapter 7

8.  Upon my appointment as chapter 11 trustee, in fulfillment of my duties under

section 1106 of the Bankruptcy Code, I commenced an investigation regarding the Debtors'

financial affairs.  As a result of this investigation, I determined that the Debtors sold substantially

all of their assets in June 2002 and no longer operated any businesses or owned any real

property; that the amount of cash and cash equivalents then held by the Debtors was less than the

allowed amount of unpaid chapter 11 administrative expense claims; that substantial

unliquidated administrative expense claims had been asserted; that absent a substantial recovery

in the Renco Group Litigation (defined below), it appeared that the Debtors' estates were

administratively insolvent; that it would not be feasible for the Debtors to propose a confirmable

plan in the foreseeable future; that continued administration under chapter 11 served no purpose

other than to cause the estates to continue to incur administrative expenses that could not be paid;

and that the vital task of prosecuting the Renco Group Litigation could be accomplished far more

efficiently under chapter 7.  Based on the foregoing, I moved to convert the Debtors' cases to

cases under chapter 7.  After such motion was granted and I was appointed chapter 7 trustee

herein, I had the bank accounts I had been maintaining as chapter 11 trustee designated as

accounts in my name as chapter 7 trustee.

**Renco Group Litigation**

9.  I believe that the pre-petition conduct of Rennert, Renco Group and other persons and

entities acting in concert with them and/or with entities controlled by them caused substantial

harm to the Debtors and their creditors.  On July 31, 2003, my special litigation counsel, Beus

Gilbert PLLC ("Beus Gilbert"), commenced adversary proceeding 03-6559 in the Bankruptcy

Court, which as described below was subsequently tried before a jury in the District Court (the

"Renco Group Litigation"), against Renco Group, Rennert, et al. (the "Defendants").  The claims

asserted in the Renco Group Litigation include those based on, inter alia, fraudulent conveyance,

aiding and abetting fraudulent conveyance, breach of fiduciary duty, aiding and abetting breach

of fiduciary duty, negligence/professional malpractice, breach of contract, negligent

misrepresentation, conspiracy, corporate waste and mismanagement, unjust enrichment, and

declaration and receipt of unlawful dividends and wrongful redemption of stock in violation of

Delaware law.

10.  On or about November 14, 2003, my special counsel filed an amended complaint.  In

January 2004, most Defendants moved to dismiss the amended complaint, and several

Defendants moved to withdraw the reference of the Renco Group Litigation to the District Court.

At the first pre-trial conference, the Court granted Defendants' motion to limit discovery pending

determination of the motions to dismiss. I filed papers opposing both the motions to dismiss and the motions to withdraw the reference. By decision and order dated May 20, 2004, United States District Judge Richard Conway Casey denied the motions to withdraw the reference. Hearings on the motions to dismiss the amended complaint were conducted on November 12 and 15, 2004, at which time Judge Gerber reserved decision.

11.   By motion dated May 5, 2005, my special counsel sought Court approval of a stipulation settling all disputes with Keith Sabel and K. Sabel Holdings, Inc., two minor Defendants in the Renco Group Litigation, for $75,000. The motion was heard and granted on July 12, 2005, and the settlement was consummated soon thereafter. At the July 12, 2005 hearing, the Court also modified its prior ruling limiting discovery to permit my counsel to depose Mr. Sabel, and to permit document production in connection therewith. The deposition of Mr. Sabel was conducted on January 16, 2006.

12.   By motion dated February 18, 2008, I sought entry of an order, pursuant to Rules 7026 and 7030 of the Federal Rules of Bankruptcy Procedure and Rules 26 and 30 of the Federal Rules of Civil Procedure, dissolving the stay of discovery and authorizing me to proceed with discovery in the Renco Group Litigation, including without limitation requests for production of documents and depositions of both parties and non-parties. All of the Defendants interposed objections. At the hearing conducted on April 2, 2008, Judge Gerber denied my motion to dissolve the stay of discovery, without prejudice to renew after 90 days, because Judge Gerber believed that there was a reasonable chance that he would issue a ruling on the motions to dismiss within such timeframe.

13.   After expiration of such 90-day period, I renewed my motion to dissolve the stay of discovery. At the hearing conducted on August 13, 2008, Judge Gerber (a) advised that the

claims against the four professional firm Defendants were not likely to survive the motions to dismiss, and (b) granted my motion in part, ruling that document discovery could proceed on the claims for relief that were likely to survive the motions to dismiss, e.g., fraudulent transfers, preferences, breach of fiduciary duty by directors and officers, declaration of illegal dividends, wrongful redemption.  Thereafter, my special counsel prepared and served revised requests for production of documents.

14.  By decision dated January 16, 2009, the Court dismissed all of the estates' claims against the four professional Defendants based on the doctrine of imputation under the so-called *Wagoner* rule but upheld most of my claims against the other Defendants.  The remaining claims included fraudulent conveyance and breach of fiduciary duty claims in excess of $100 million against former officers, directors and/or shareholders of the Debtors, which I prosecuted aggressively to a successful conclusion.

15.  On May 11, 2010, I filed a motion seeking authority to retain and employ one or more consulting and testifying experts in connection with the Renco Group Litigation without the need to disclose the identity of such experts or the nature of such engagements at this time. The purpose of this motion was to avoid giving an unfair advantage to the Defendants, because they were free to retain experts without having to disclose any information at that time.  On June 16, 2010, the motion was granted over the opposition of the Defendants in the Renco Group Litigation, and thereafter I engaged four experts to assist in prosecution of the Renco Group Litigation.

16.  On July 1, 2010, the Court granted in part Defendants' motion to restrict the scope of discovery on environmental claims in light of a ruling in the DOJ Action dismissing certain of the environmental claims that had been brought under the Resource Conservation and Recovery

Act or RCRA.  Thereafter, the 10th Circuit Court of Appeals reversed and remanded the decision

of the District Court dismissing the RCRA environmental claims.  As a result, my special

counsel negotiated a stipulation with Kaye Scholer, Defendants' then counsel, under which the

scope of discovery on environmental claims was broadened, and discovery taken in the DOJ

Action may be used in the Renco Group Litigation (subject to confidentiality restrictions).

17.  Thereafter, both the District Court in the DOJ Action and the Bankruptcy Court in

the Renco Group Litigation approved stipulations allowing discovery taken in the DOJ Action to

be used in the Renco Group Litigation (subject to confidentiality restrictions).  In light of these

developments and subsequent scheduling difficulties, the deadlines for the completion of fact

discovery and expert discovery were extended several times.  In August 2011, I accompanied my

experts in the Renco Group Litigation on a plant tour of MagCorp's former magnesium

production facility in Rowley, Utah.  The parties began exchanging expert reports in May 2012,

and thereafter conducted depositions of expert witnesses.

18.  On March 15, 2013, the parties filed motions for summary judgment and related

pleadings, and Defendants filed motions to preclude the testimony of two of my experts.  On

May 6, 2013, the parties filed responses to each other's motions.  Reply papers were filed June 7,

2013.  Oral argument on the motions for summary judgment and related motions to preclude

testimony was conducted on July 24, 2013.

19.  At the conclusion of the July 24, 2013 hearing, the Bankruptcy Court issued its

ruling denying the Defendants' motions to preclude the testimony of two of my experts.  At a

further hearing conducted on July 30, 2013, the Bankruptcy Court issued its ruling: (a) granting

Defendants' motion for summary judgment in part to the extent of dismissing in their entirety my

claims for negligent misrepresentation set forth in Counts 28 and 36 of my Amended Complaint,

and otherwise denying Defendants' motion for summary judgment in all respects; and
(b) granting my motion for partial summary judgment.  I did not believe that the dismissal of my
claims for negligent misrepresentation would have any effect on the merits of my litigation
claims against the Defendants.  On August 26, 2013, the Bankruptcy Court entered an order
memorializing the foregoing relief.

20.  On September 9, 2013, in what appeared to be an act of desperation to try to delay
their day of reckoning, the Defendants filed a motion for leave to appeal from entry of the order
denying their three motions.  My opposition papers were filed on September 23, 2013, and
Defendants filed their reply papers on October 3, 2013.  The motion for leave to appeal was
argued before District Judge Paul A. Engelmayer on November 6, 2013.  Judge Engelmayer
found that the Defendants had failed to satisfy any of the three prongs necessary to justify the
granting of an interlocutory appeal, and therefore he denied the motion from the bench.

21.  Separately, because the Defendants would not consent to a jury trial being conducted
before the Bankruptcy Court, on November 5, 2013 my special litigation counsel filed a motion
to withdraw the reference with respect to the Renco Group Litigation to the District Court.  On
December 11, 2013, the motion to withdraw the reference was granted without opposition by
District Judge Robert W. Sweet.  Thereafter, the Renco Group Litigation was assigned to District
Judge Alison J. Nathan.

22.  Since the time that the Bankruptcy Court ruled on the summary judgment and expert
preclusion motions, my special counsel had been preparing this case for trial, a job made more
arduous and time-consuming as a result of the Defendants' repeated stall tactics.  For instance, in
June 2014, the Defendants made another round of motions to preclude the testimony of two of
my experts and also filed a motion for a protective order to bar me from calling the Defendants

as witnesses in my case. Just as Judge Gerber had done, Judge Nathan denied the expert

preclusion motions. She also denied the motion for a protective order.

23. On August 29, 2014, after months of hard work, the Joint Final Trial Report was

filed with the Court. In September 2014, the Defendants filed eleven motions *in limine* and my

special counsel filed seven motions *in limine*. On November 7, 2014, two lawyers from Park

Jensen Bennett LLP filed appearances in the Renco Group Litigation. Park Jensen Bennett LLP

served as co-counsel with Kaye Scholer through the trial in this matter.

24. On November 12, 2014, in yet another brazen stall tactic, Defendants' new lawyers

filed a letter requesting expedited briefing and hearing on motions: (1) seeking to limit my right

to a jury trial (they wanted fraudulent transfer, preference and unlawful dividend claims tried to

the Court and not to the jury); (2) belatedly raising statute of limitations and statute of repose

issues under Utah law (essentially asking for permission to file a motion for partial summary

judgment on limitations and repose issues); and (3) attempting to raise as a new affirmative

defense that the stock redemption and dividend payments were "settlement payments" protected

by the safe harbor under section 546(e) of the Bankruptcy Code. The Defendants apologized for

raising these issues so belatedly, but argued that the case is "complicated."

25. My special counsel replied by letter dated November 14, 2014, pointing out that

Defendants' requests were woefully untimely and lack any merit. At a hearing held on

December 19, 2014, the District Court denied all three motions that Defendants' new counsel

had made, and ruled on most of the motions *in limine.* The rest of the motions *in limine* were

decided by the time of trial.

26. On January 16, 2015, the parties attended a court-ordered mediation before

Magistrate Andrew Peck. The Defendants had no interest in offering anything other than a

pittance, and so the mediation concluded unsuccessfully. Thereafter, my legal team and I continued preparing for trial.

27. On January 23, 2015, Renco Group (through yet another set of lawyers, Dickstein Shapiro LLP) filed a motion in the Bankruptcy Court for leave to object to the claims of certain creditors of Renco Metals (the "Claims Motion"). On February 4, 2015, I filed a response in opposition to the Claims Motion, pointing out that Renco Group had an ulterior motive, *i.e.*, Renco Group was seeking to disallow claims against Renco Metals in a fruitless attempt to deprive me of a triggering creditor under section 544(b) of the Bankruptcy Code, which allows a trustee to avoid any transfer that is voidable under applicable non-bankruptcy law by a creditor holding an unsecured claim. I relied on section 544(b) of the Bankruptcy Code and applicable New York law to avoid as fraudulent conveyances the dividends and other payments at issue in the Renco Group Litigation (although I also sought damages under other legal theories that were not dependent on section 544, such as breach of fiduciary duty and unjust enrichment). At a hearing conducted on February 10, 2015, Judge Gerber agreed with me and denied the Claims Motion. An order to that effect was entered on February 19, 2015.

28. The jury trial commenced on February 2, 2015 and concluded on February 27, 2015, at which time the jury returned a verdict in my favor in the aggregate amount of $118,220,000, consisting of (a) an award of damages against Renco Group in the amount of $101,000,000, (b) an award of damages against Ira Rennert and the trustees of trusts established by Ira Rennert (the "Rennert Trusts"), jointly and severally, in the amount of $16,220,000, and (c) and an additional award of $1,000,000 in punitive damages against Renco Group. The jury did not impose any liability on the other Defendants. The jury verdict in the aggregate amount of

$118,220,000 represents nearly 99% of the $118,445,675 that I sought to recover in the Renco Group Litigation.

29.   Thereafter, at the request of District Judge Alison J. Nathan, the parties briefed the issues concerning prejudgment interest - the appropriate rate and from what date interest should accrue.  On March 16, 2015, the District Court issued its Memorandum & Order determining that prejudgment interest would be applied at the rate of 6% per annum, not compounded, and commencing on August 2, 2001 (*i.e.*, the Petition Date).  Thereafter, on March 20, 2015, yet another set of new lawyers, Orrick, Herrington & Sutcliffe LLP ("Orrick"), filed an appearance on behalf of Defendants.

30.   On March 23, 2015, after calculating interest on the jury awards, the Clerk entered judgment in the aggregate amount of $214,199,093.70 in my favor, as follows: (a) against Renco Group in the amount of $184,698,246.58, and (b) against Ira Rennert and the Rennert Trusts, jointly and severally, in the amount of $29,500,847.12.  *Buchwald v. The Renco Group, Inc., et al.*, 13-cv-07948-AJN, Docket No. 389.  Postjudgment interest shall apply at the applicable rate under 28 U.S.C. § 1961.

31.   On April 2, 2015, Judge Nathan approved a stipulation imposing a stay of execution on the judgment until 30 days after disposition of Defendants' upcoming post-trial motion under Federal Rules of Civil Procedure 50 and 59, subject to Defendants' posting of a supersedeas bond in an amount in excess of $237 million.  On April 2, 2015, Defendants posted a supersedeas bond in the amount of $237,762,000.

32.   On April 20, 2015, Renco Group, Ira Rennert and the Rennert Trusts (the three Defendants against whom judgment was entered) filed a motion under Rules 50 and 59 of the Federal Rules of Civil Procedure asking the District Court to enter judgment as a matter of law,

or in the alternative to order a new trial.  The Defendants first argued, *inter alia*, that (a) I failed

to present sufficient evidence of solvency to support the verdict, arguing for at least the fourth

time that the testimony of my insolvency expert should be precluded under *Daubert v. Merrell*

*Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), (b) the unjust enrichment and fraudulent

conveyance claims fail against Rennert as a matter of law, and (c) punitive damages should be

struck as a matter of law; and then, in the alternative, that a new trial should be ordered, *inter*

*alia*, because (a) the evidence of environmental contamination at the Debtors' Rowley facility

was highly prejudicial, and (b) the jury reached an improper compromise verdict.  The

Defendants against whom judgment was not entered also filed a motion requesting that, if a new

trial is ordered, then they should not have to defend again the claims I made against them in the

first trial.

33.  Also on April 20, 2015, Beus Gilbert filed a motion under Rule 59 to amend the

judgment, requesting that the rate of prejudgment interest be increased from 6% to the 9% annual

rate provided by New York State law, and that interest be calculated from July 2, 2000, the last

date the Debtors had paid interest on the 1996 Notes. Opposition papers were filed by the parties

to the three sets of post-trial motions on May 7, 2015.  Reply papers were filed May 18, 2015.

34.  By decision and order entered on August 19, 2015 [Dist. Ct. Docket No. 423], Judge

Nathan ruled on the parties' post-trial motions, as follows: (a) the motion by Defendants Renco

Group, Ira Rennert and the Trustees of the Rennert Trust for judgment as a matter of law was

granted in part, but only with respect to my claims for unjust enrichment and punitive damages,

and denied in all other respects; (b) the same Defendants' motion for a new trial was denied;

(c) the remaining Defendants' motion for judgment as a matter of law was denied as moot; and

(d) my motion to alter or amend the judgment to increase the amount of prejudgment interest was

denied.  Judge Nathan requested that the Clerk amend the judgment accordingly.  Defendants filed a Notice of Appeal on August 20, 2015.

35.    The Clerk entered an amended judgment on August 24, 2015 [Dist. Ct. Docket No. 425] (the "Amended Judgment").  The end result was that I kept all of my claims from the original judgment except for the $16.22 million claim against the Trustees of the Rennert Trust (for which Ira Rennert was still liable under two theories of recovery) and the $1 million punitive damages award.  The judgment remained the same in all other respects, *i.e.*, against Renco Group in the amount of $183,698,246.58 (plus post-judgment interest) and against Ira Rennert in the amount of $29,500,847.12 (plus post-judgment interest), for an aggregate recovery in the amount of $213,199,093.70 (plus post-judgment interest).

36.    On September 16, 2015, I filed a Notice of Cross-Appeal with respect to issues concerning prejudgment interest.

37.    On September 18, 2015, the District Court approved a stipulation staying me from executing or otherwise enforcing the Amended Judgment until the Second Circuit issues its mandate in the case, provided that the amended bond shall remain in full force and effect.

38.    On September 23, 2015, the Defendants against whom judgment was not entered filed a Notice of Appeal with respect to their request to be excused from a new trial in the event one is ordered.

39.    On September 23, 2015, a non-substantive amendment was made to the Amended Judgment, and thereafter the parties filed amended Notices of Appeal and Cross-Appeal with respect thereto.

40.    After the Defendants retained an appellate specialist at Orrick to represent them on their appeal from the Amended Judgment, I determined that it was in the best interests of the

Debtors' estates for me to retain my own appellate specialist. Unfortunately, the estates had

insufficient funds to employ appellate counsel on standard hourly rates. With the assistance of

my counsel Stevens & Lee ("S&L"), I devised a compensation package predicated on a fixed fee

but with payment thereof contingent upon a successful appellate result. With the assistance of

S&L, I then began a selection process that included meeting with some of the top appellate

lawyers in the country before I ultimately selected Kellogg Huber Hansen Todd Evans & Figel

PLLC ("Kellogg Huber").

41. By application dated September 16, 2015, I sought this Court's authorization,

pursuant to Section 327(a) of the Bankruptcy Code and Fed. R. Bankr. P. 2014(a), to retain

Kellogg Huber as special appellate counsel; thereafter, the firm's name was changed to Kellogg,

Hansen, Todd, Figel & Frederick P.L.L.C. ("KHTFF"). By order dated September 29, 2015

("KHTFF Original Retention Order"), this Court granted the application to retain KHTFF as

special appellate counsel. The KHTFF Original Retention Order provided that KHTFF's

compensation for its services would be on a sliding scale fixed fee basis, but contingent upon

obtaining a successful result (including a settlement) and its fees would be payable only out of

recoveries. It further provided that, if the Amended Judgment is affirmed by the appellate court

with a reduction of more than 30% of the monetary damages awarded under the Amended

Judgment, or if the Amended Judgment is reversed, or if the case is remanded in a manner that

would require a new trial of the merits of the claim, then no fee would be due to KHTFF for

services rendered.

42. On December 3, 2015, Defendants filed their opening appellate brief raising three

issues: (1) whether the jury reached an impermissible compromise verdict; (2) whether the

District Court prohibited Defendants from presenting highly probative evidence demonstrating

that my allegations of environmental liability were overblown; and (3) whether I had the right to a jury trial on my claims.

43.  On March 3, 2016, I filed my response thereto and the opening brief on my Cross-Appeal on whether I was entitled to prejudgment interest under Delaware law that exceeds such interest under New York law.  On May 2, 2016, Defendants filed their combined brief replying to my response and responding to my Cross-Appeal.  My reply was filed on May 16, 2016.

44.  In the spring of 2016, I asked KHTFF to provide additional services beyond the scope of its initial retention in order to assist me in marketing the Renco Litigation Interest (defined below), and in June 2016 I agreed that, if a sale was consummated, I would promptly seek *nunc pro tunc* authority to expand the terms of KHTFF's retention to include its time spent thereon.  On September 20, 2016, I filed an application to expand the retention of KHTFF to include the following services to be compensated on an hourly basis for: (a) representing me in connection with a petition for rehearing *en banc* before the United States Court of Appeals for the Second Circuit, a petition for *certiorari* to the United States Supreme Court, or further proceedings in the United States District Court for the Southern District of New York, and (b) time spent by KHTFF concerning the sale of the Renco Litigation Interest.  Such application was granted by order dated October 13, 2016.  KHTFF served as co-counsel with Beus Gilbert with respect to Defendants' appeal and my Cross-Appeal.

45.  Oral argument was conducted on February 9, 2017 before Circuit Judges Raggi, Lohier and Droney.  On March 8, 2017, the Second Circuit issued its Summary Order and Judgment denying the appeal, affirming the Amended Judgment in the full amount and denying my Cross Appeal.

46.    On April 5, 2017, Defendants filed a petition for panel rehearing, or, in the

alternative, for rehearing *en banc*.  On May 11, 2017, the Second Circuit denied Defendants'

petition *in toto*.  On May 17, 2017, Defendants filed a motion to stay the mandate with the

Second Circuit Court of Appeals.  On May 18, 2017, the Second Circuit Court of Appeals

granted Defendants' motion to stay the mandate.

47.    On August 9, 2017, Defendants filed a Petition for Writ of Certiorari to the Second

Circuit Court of Appeals with the United States Supreme Court, raising an alleged Circuit split

on my right to a jury trial.  On September 6, 2017, I filed a Brief in Opposition to Defendants'

Petition for Writ of Certiorari to the Second Circuit Court of Appeals with the United States

Supreme Court, pointing out that the alleged Circuit split was illusory because Defendants had

expressly consented to a jury trial and therefore the Second Circuit had not reached this

Constitutional issue, and in any event this case was not an appropriate vehicle to resolve a

bankruptcy trustee's right to a jury trial.  On September 19, 2017, Defendants served their reply

brief.

48.    On October 10, 2017, the Supreme Court denied Defendants' Certiorari Petition.  On

October 12, 2017, the Second Circuit issued its Mandate.  On October 12, 2017, the Defendants

agreed to pay the Amended Judgment in full, including postjudgment interest in excess of

$1 million and costs in excess of $107,000.  On October 27, 2017, I received $76,753,505.53

from two of the three sureties which bonded the Appeal (Atlantic Specialty and Nationwide).  On

October 30, 2017, I received $137,941,614.16 from Zurich American (the third surety which

bonded the Appeal), leaving a shortfall in the amount of $2,828.76, which Renco Group then

paid.  In total, I collected $214,697,948.45 on account of the Amended Judgment.  On

October 31, 2017, I filed a Notice of Receipt and Disposition of Renco Group Litigation
Proceeds.

49. Throughout this process, I continued to supervise litigation strategy and oversaw
developments in the Renco Group Litigation. Among other things, I reviewed and commented
on numerous pleadings and documents (including *Daubert*, summary judgment and *in limine*
motions, the pre-trial order, and demonstrative trial exhibits), attended selected depositions,
discussed discovery progress and results with Beus Gilbert, reviewed and commented on expert
reports, attended a mock trial and participated in debriefing sessions, assisted in trial preparation,
participated in numerous strategy meetings and discussions, attended a mediation session before
Magistrate Judge Peck in January 2015, attended the February 2015 trial, reviewed and
commented on post-trial filings and appellate briefs, assisted in preparation for and attended oral
argument before the Second Circuit, reviewed and commented on post-ruling briefs before the
Second Circuit and the Supreme Court, participated in strategy sessions, participated in pre- and
post-trial settlement discussions, and negotiated with Renco Group and the sureties for prompt
payment of the Amended Judgment in full, including postjudgment interest in excess of $1
million and costs in excess of $107,000.

## Sale of Interest in Litigation Proceeds

50. As of early 2016, I only had about $670,000 in the bank and no other assets, but for
the $213 million Amended Judgment (then on appeal) against Ira Rennert and Renco Group.
Creditors are owed over $200 million and had no chance of any recovery other than from the
Amended Judgment. I was concerned with the risk that the Amended Judgment might be
reversed on appeal, and that I would not have sufficient resources to continue litigating against
well-funded adversaries. I also wanted to be sure that long-suffering creditors would receive
recoveries regardless of the outcome of the appeal.

51.  Therefore, in March 2016, I conceived the idea of reaching out to litigation funders to monetize a portion of this significant but speculative asset.  I asked my counsel S&L to assist me in this endeavor.  I researched and investigated various litigation funders and asked S&L to prepare and send a tickler to each of them.

52.  S&L structured a sale of an interest in net recoveries from the proceeds of the Renco Group Litigation, and assisted me in running a private sale process, negotiating with multiple litigation funders and ultimately negotiating a stalking horse bid.  On June 23, 2016, S&L filed a motion for approval of the stalking horse bid (subject to better bids), and assisted me in running a public auction process after approval of the bid procedures.  As a result of the public auction, the net economic benefit to the estates was improved by nearly $5 million, *i.e.*, the consideration received by the estates was increased from $25 million to $26.2 million, while the consideration that may be payable by the estates was reduced from $53,750,000 to $50,000,000.  I evaluated the competing bids that were submitted in both the private sale process and the public auction, and participated in negotiations.

53.  After two hotly contested hearings in this Court and one in the District Court, I obtained Court approval of an agreement whereby I sold an interest in the potential litigation recoveries to AEM SPV, LLC ("AEM"), an affiliate of one of the largest litigation funders in the world, Gerchen Keller (which was acquired by Burford Capital in December 2016), for $26.2 million.  This enabled me to monetize a portion of this speculative asset, hedge the estates' downside exposure, provide much needed liquidity to the Debtors, and guarantee that there will be money for creditors.  As reported in the *American Lawyer* and other media outlets, no transaction like this has ever been done in a pending bankruptcy case.

54. The Renco Group and Ira Rennert, and an *ad hoc* consortium of noteholders (the "Noteholder Consortium"), each took separate appeals from the sale order. I was successful in overcoming a motion by the Noteholder Consortium for a stay pending their appeal of the sale order. In connection with each of the three hearings held on this matter, I submitted detailed declarations in support thereof and I also testified at the bid procedures hearing. The sale closed on September 8, 2016, and I received $26.2 million ("Sale Proceeds") at closing. Thereafter, I filed a motion in the District Court to dismiss the appeals as moot.[1] By Memorandum & Order dated July 18, 2017, the District Court dismissed the appeal of the Renco Group and Ira Rennert.

55. On October 31, 2017, after full payment of the Amended Judgment, I paid $50,503,901.37 to AEM in full satisfaction of its claim under the Sale Agreement.

**Stipulation Concerning Payment of Additional Interest Paid to AEM**

56. I had a dispute with Renco Group over the timeliness of the satisfaction of the Amended Judgment. Delay in payment of the Amended Judgment, which I believed was attributable to Renco Group's conduct and otherwise avoidable, engendered the accrual of additional interest due to AEM. In order to avoid potentially expensive litigation with Renco Group, I instructed my counsel to negotiate a resolution of this dispute. Such negotiations culminated in execution of a settlement stipulation (the "Interest Stipulation") under which the estates' claims against Renco Group for the additional interest I had to pay to AEM was resolved for a lump sum payment from Renco Group of $55,989.06 in cash (representing six days' of interest I paid to AEM). A motion for approval of the Interest Stipulation was filed with the Court on December 29, 2017. The Interest Stipulation was approved on February 1, 2018, and

---

[1] The Noteholder Consortium subsequently withdrew its appeal consensually, but Rennert and Renco Group continued to prosecute their appeal.

Renco Group paid promptly thereafter. This settlement resolved a minor estate issue without the need for costly litigation.

## **Preference Actions**

57.   After conversion to chapter 7, I directed my professionals to investigate potential avoidance actions against third parties. This effort was hindered by the Debtors' former principals' lack of cooperation in turning over books and records, and so I had to subpoena records from the Debtors' pre-petition banks. In March 2004, I commenced over 150 actions to avoid preferential transfers (the "Preference Actions").[2] The Preference Actions are identified in Exhibit A to the interim report I filed on May 13, 2004.[3] On March 22, 2004, the Bankruptcy Court entered an Order Establishing Procedures Governing All Adversary Proceedings Brought Pursuant To 11 U.S.C. Sections 544, 547, 548 And 550 (the "Procedures Order"), which provides, *inter alia,* "that, with respect to the settlement of any Avoidance Action (whether or not an adversary proceeding has been commenced), the Trustee shall be authorized to consummate the proposed settlement without order of the Court or consent of any other party."

58.   By 2007, I had consummated settlements of over 120 Preference Actions for aggregate cash consideration of approximately $2.4 million, and had been filing regular reports with respect thereto, pursuant to the terms of the Procedures Order. I dismissed some Preference Actions after the respective defendants were able to provide documents establishing complete defenses. I also obtained default judgments against a number of defendants. To spare expense, I engaged C&W Consultants to pursue all default judgments where my counsel was not in active negotiations. C&W Consultants were able to collect approximately $73,000 (net of fees of C&W Consultants) from ten different judgment debtors.

---

[2] One additional Preference Action was commenced in June 2004. Each Preference Action also seeks to avoid the transfers at issue as constructive fraudulent conveyances, usually as a precautionary measure.
[3] In addition, I resolved three preference claims without having to file a complaint.

59.  By 2007, all Preference Actions have been resolved except for the most hotly contested preference action, Adversary Proceeding No. 04-02656 against Williams Energy Marketing & Trading Co., f/k/a Barrett Resources ("Williams"), where the amount in controversy exceeded $3 million.  I participated in eight depositions (including my own deposition and the depositions of three experts).  I oversaw negotiations between my counsel and counsel to Williams.  When such negotiations failed to bear fruit, I authorized my counsel to file a motion for summary judgment, and to respond to the motion for summary judgment filed by Williams.  Under a summary judgment motion, the moving party asserts that there are no disputed issues of material fact and so judgment can be granted in movant's favor as a matter of law.  These motions address the principal defenses raised by Williams, *viz.*, the forward contract safe harbor under section 546(e), the ordinary course of business and subsequent new value, and involve complex issues.  I attended oral argument on the cross-motions, which was conducted on June 5, 2007, at which time the Court reserved decision.  In November 2009, the parties filed supplemental briefs on the decision of the United States Court of Appeals for the Fourth Circuit in *Hutson v. E.I. du Point de Nemours and Company (In re National Gas Distributors, LLC)*, 2009 WL 325436 (4th Cir. 2009), which addressed the section 546(e) forward contract defense.

60.  Unfortunately, after the action against Williams was commenced, the case law on the section 546(e) forward contract safe harbor continued to evolve in a manner prejudicial to the estate, *i.e.*, nearly all courts construed the defense broadly.  By decision and order dated October 17, 2011 (the "Williams Decision"), the Court determined that there were disputed issues of material fact on both the section 546(e) forward contract safe harbor and the ordinary course of business defense.  Therefore, the Court held that judgment could not be granted in either party's favor as a matter of law, and denied the summary judgment motions filed by both

parties.  Thereafter, the parties agreed to try to resolve their differences through mediation.  A

mediation session was conducted on March 15, 2012 and was adjourned without date while the

parties continued to evaluate their respective positions.  Thereafter, in October 2012, I settled the

Williams action for a cash payment of $125,000 and a waiver of all claims.  Based on the

strength of the section 546(e) forward contract defense and the Williams Decision, I believe that

represented the best result achievable.  Thus, all Preference Actions have been resolved.

### Claims Analysis and Reconciliation Process

61.  As a result of the successful sale of an interest in the Renco Group Litigation, I

believed there would be funds available for distribution to creditors.  Thus, shortly after receipt

of the Sale Proceeds, I commenced the claims reconciliation process, and obtained the entry of

this Court's Order setting March 1, 2017 as the final date for all entities holding claims against

the estates to file proofs of claim.[4]

62.  On April 28, 2017, my counsel filed seven sets of objections to approximately

100 claims. On May 3, 2017, my counsel filed another seven sets of objections to approximately

575 claims.  All 14 sets of objections to claims were heard by the Court on June 13, 2017, and

subject to revisions set forth on the record, the claims objections were granted.

63.  On September 7, 2017, my counsel filed four additional claims objections, which

were approved by the Court without the necessity for a hearing by four orders entered on

November 2, 2017.

64.  On December 8, 2017, my counsel filed four additional claims objections, which

were approved by the Court without the necessity for a hearing by four orders entered on January

30, 2018.

---

[4] By So-Ordered Stipulation and Order dated February 28, 2017, the deadline to file proofs of claim for the United States of America, including its agencies, departments and agents, and the State of Utah was March 15, 2017.

65.   Between June 6, 2018 and July 20, 2018, my counsel filed three new claims objections and completed the prosecution of a previously filed clam objection.  Three of the claims objections were approved by the Court without the necessity for a hearing by three orders entered on August 24, 2018; the fourth claim objection was approved by the Court without the necessity for a hearing by order entered on October 4, 2018.

66.   Through October 4, 2018, I had filed 25 objections to 694 claims aggregating approximately $62.5 million, all of which have been fully resolved.  Other than with respect to the major claims described in the following sections of my Report, the claims objection process is now complete.

67.   Earlier this year, my counsel engaged in extensive discussions with the professionals retained in the Debtors' Chapter 11 cases in an effort to have the professionals file final fee applications for prior interim fee awards entered during the Chapter 11 cases.  As a result of such efforts, all but two of the professionals filed final fee applications.  On October 1, 2018, I filed an objection to the two professionals that did not file final fee applications.  The hearing to consider both the chapter 11 professionals' final fee applications and the objection is scheduled for November 15, 2018.

68.   I, along with my attorneys, was involved in the process of reviewing and reconciling the proofs of claim, as well as in the preparation of the Claims Objections.  In this regard, I, in consultation with my attorneys, (a) reviewed (i) the claims register, by which we identified the claims set forth in Claims Objections, (ii) the Debtors' books and records with respect to the claims set forth in the Claims Objections, (iii) the documents and other evidence provided by the claimants, and (iv) various court orders, along with a reconciliation thereof; (b) approved the

inclusion of the claims in the Claims Objections; and (c) reviewed the Claims Objections and the proposed orders with respect thereto.

## Principal Issues Remaining in the Case

69.  Since shortly before collection on account of the Amended Judgment, I have been working hard to resolve the following issues in the case (collectively, the "Remaining Issues"), each of which is described in greater detail below: (a) a determination of the allowed amount of the claims of (i) the EPA and other environmental agencies, (ii) Wilmington Trust, as indenture trustee ("Indenture Trustee") with respect to the Senior Notes, (iii) the Pension Benefit Guaranty Corporation ("PBGC"), and (iv) certain insiders; (b) an allocation of the Renco Group Litigation proceeds and the Sale Proceeds between the estates of the two Debtors; and (c) Renco Group's appeal from the order dismissing its complaint in the Renco Adversary Proceeding (defined below).  As described below, in late 2018, I orchestrated a consensual resolution of all of the Remaining Issues, which should enable me to make final distributions to the Indenture Trustee and trade creditors in mid-2019, and hopefully other creditors soon thereafter.

## Environmental Claims

70.  The most complicated of the Remaining Issues relate to the environmental claims. On January 16, 2001, the EPA filed suit in the United States District Court in Utah, case number 2:01 CV 040 (the "Utah Environmental Litigation") seeking "to obtain injunctive relief and civil penalties for . . . numerous violations of the Resource Conservation and Recovery Act of 1976 ("RCRA"), 42 U.S.C. §§ 6901 *et seq.*" as well as $900 million in civil penalties.  In 2005, the government filed an additional, related complaint, which was consolidated with its RCRA complaint, alleging violations of a different statute, the Toxic Substances Control Act ("TSCA").  *See United States v. Magnesium Corp. of Am.*, 616 F.3d 1129, 1134 (10th Cir. 2010)

(reversing District Court's grant of summary judgment on twelve counts of the United States' second amended complaint).

71.    Since the Tenth Circuit's reversal in 2010, the case has remained in limbo, with the parties attempting to reach a settlement and submit a consent decree to the District Court ("RCRA Consent Decree").  On September 30, 2014, the District Court issued an order administratively closing the case, allowing for reopening upon motion.

72.    In their most recent status report to the District Court, filed on February 12, 2016, the parties indicated that settlement negotiations are ongoing, but that finalization of the settlement documents "has been delayed . . . due to complex technical issues that EPA and [US Mag] are working through" and further that MagCorp's bankruptcy and litigation related thereto "has complicated settlement efforts."  [Case No. 2:01-cv-00040, Dkt. No. 446].  It is my understanding that the parties have been attempting to determine what needs to be done to clean-up hazardous wastes at the Rowley Facility and prevent further hazardous emissions, a process that will likely take years, as well as negotiating the RCRA Consent Decree.

73.    On March 13, 2017, the EPA and various federal and Utah state agencies (collectively, the "Government") filed multiple environmental claims against the Debtors (supplementing but not superseding their prior claims), under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA") and other federal and state laws in an aggregate amount of at least $127,601,122.00 (excluding penalty claims), an undetermined portion of which the Government asserts is entitled to Chapter 11 administrative expense priority.  The Government's environmental claims include the following components: (a) EPA's incurred CERCLA response and oversight costs of $5,974,371.05 and estimated future costs of $100.6 million; (b) the Bureau of Land Management's ("BLM") incurred CERCLA response and

oversight costs of $361,000 and estimated future costs of $1,312,000; (c) costs incurred by the

BLM and Fish & Wildlife Services in connection with damage to plants and wildlife in the

amount of $123,694 and estimated future costs of $12,942,048; (d) a claim for trespass related to

the mining of minerals without a mineral lease in the amount of $167,399.46 plus interest;

(e) estimated future land reclamation liabilities of $6,051,640; (f) unpaid rent under a right-of-

way with respect to Government owned land known as Knolls Facility in the amount of

$68,969.96, for which the Government asserts administrative priority status; (g) unliquidated

injunction liabilities; and (h) civil penalties in an unliquidated amount for the period beginning

five years prior to January 16, 2001 and continuing post-petition through the sale of the Rowley

Facility to US Mag.

74.    The Government asserts that US Mag, Renco Group and other related parties ("US

Mag Parties") are jointly and severally liable with the Debtors under Section 107 of CERCLA

with respect to the contamination of the Rowley Facility.  Therefore, to the extent the Debtors

satisfy any portion of the EPA's CERCLA claim, I will assert a claim under Section 113 of

CERCLA for equitable allocation between the US Mag Parties and the Debtors of such

CERCLA liability ("Debtors' CERCLA Contribution Claim").  However, before resorting to

litigation, I have been attempting to negotiate a global resolution of the environmental claims

against the Debtors and all of the US Mag Parties, to include and avoid the need for litigation of

the Debtors' CERCLA Contribution Claim.

75.    The Government alleges that the Rowley Facility generated at least five different

hazardous wastes and/or treated, stored, or disposed of them in on-site landfills, ditches, and

surface impoundments, and that it also generated and/or treated, stored or disposed of solid waste

containing hazardous substances, including dioxins, furans, hexachlorobenzene ("HCB"),

polychlorinated biphenyls ("PCBs"), arsenic, chromium, mercury, acidic waste water, and polycyclic aromatic hydrocarbons ("PAHs").  I took a similar position during the course of the Renco Group Litigation.

76.   During the February 2015 trial of the Renco Group Litigation, my former environmental expert testified that, as of July 1996, the environmental liabilities were between approximately $36 million and $67.5 million,[5] while the Defendants' environmental expert testified that the environmental liabilities were between approximately $3 million and $11.3 million.

77.   After I won the appeal of the Amended Judgment in the Second Circuit in March 2017, and in order to avoid any delays in distributing litigation recoveries to creditors, I determined that it was an appropriate time to investigate the environmental claims in greater detail.  Because of the magnitude of the environmental claims being asserted by the Government, I determined that I needed to retain environmental consultants, which I was only able to do at that time because I had the proceeds of the non-recourse financing provided by AEM.

78.   Unfortunately, as of spring 2017, my former environmental expert who had testified at the February 2015 trial was no longer available.  Therefore, with the assistance of S&L, in or about April 2017, I began a selection process that included reviewing the credentials of several prospective consultants and interviewing the best candidates.  Ultimately, I selected Roux Associates, Inc. ("Roux").  By order dated June 22, 2017, I obtained Court approval to retain Roux as environmental consultants to assist me in evaluating the Government's environmental claims, and if necessary, provide expert testimony, effective as of May 25, 2017, the date of execution of Roux's retention agreement.  With the assistance of S&L and Roux, I have been

---

[5] My former environmental expert who testified at trial did not opine on the Government's penalty claims or any claims that arose after July 1996, including Chapter 11 administrative expense claims.

conducting an in-depth analysis of the environmental claims, which has included the review of
voluminous documents by Roux, S&L and me, and numerous telephonic and in-person meetings.

79.    There are two sets of parties with first-hand knowledge of the environmental claims:
the Government and the US Mag Parties.  Therefore, in an attempt to resolve these claims
consensually, my counsel requested information and documentation on a confidential basis and
pursuant to FRE 408 from the Government since March 2017 (shortly after the claims were
filed) and the US Mag Parties since August 2017.

80.    As part of our analysis of the Government's environmental claims, we asked Renco
Group to provide us with an interactive site visit.  On October 18, 2017, my professionals and I
conducted a site inspection of the Rowley Facility.  Tom Tripp, US Mag's Technical Services
Manager, guided us on our site inspection and answered all of our questions.  Mr. Tripp was
accompanied by lawyers and consultants for the US Mag Parties, who also responded to our
inquiries and provided insights.  As a result, the site inspection was very helpful and informative.

81.    In December 2017, the Government requested the negotiation of a protective order
concerning the confidential information that was being exchanged by the parties.  My counsel
negotiated the terms thereof with the Government, Renco Group and US Mag, and such
protective order was approved by the Court on December 27, 2017 (the "Protective Order").
Unfortunately, even after entry of the Protective Order, concerns over confidentiality engendered
significant delays in the exchange of confidential information, and thus the completion of the
initial phase of my analysis of the environmental claims.

82.    After completing our preliminary analysis, my counsel, consultants and I met with
representatives of the Government on April 12, 2018 to present our preliminary evaluation of the
environmental claims.  Additional issues were raised at that meeting, and I requested

supplementary information from the Government to address those concerns.  The parties

conducted follow-up telephone conferences on May 16 and June 25, 2018.

83.  On May 22, 2018, my counsel, advisors and I met with representatives of the US

Mag Parties to obtain further input from them with respect to the environmental claims.

Thereafter, S&L sent a detailed list to counsel for the US Mag Parties requesting additional

information and documentation to address issues that arose at the May 22 meeting.

84.  Roux reached preliminary conclusions by June 2018.  Nevertheless, through August

2018, S&L continued to follow up with the parties concerning prior information requests that

were then still outstanding to ensure that no relevant data was overlooked so that my advisors

and I could ascertain the appropriate amount of the Government's environmental claims.

### Claims of the Indenture Trustee

85.  A predecessor in interest to the Indenture Trustee filed claims in the amount of

approximately $169.5 million, representing $150 million in principal amount plus accrued pre-

petition interest, against both Metals (based on its issuance of the Senior Notes) and MagCorp

(based on its guarantee of the Senior Notes).

86.  The claims of the Indenture Trustee are subject to attack because the Debtors did not

receive fair consideration in exchange therefor.  Upon issuance of the Senior Notes in July 1996

in the aggregate amount of $150 million, the Debtors only received $143.5 million in net

proceeds, most of which was promptly misappropriated.  At the time the Senior Notes were

issued by Metals and guaranteed by MagCorp, the Debtors were insolvent or were rendered

insolvent by paying dividends to, and redeeming stock from, Renco Group in an aggregate

amount exceeding $83.5 million and paying approximately $5.3 million to corporate executives.

Moreover, the issuance of the Senior Notes permitted Renco Group to continue receiving

dividends aggregating $13.8 million and paying $966,000 to corporate executives through

December 1998.  In total, over $103.5 million was paid to insiders without any consideration at or after the issuance of the Senior Notes, and as a result thereof.

87.  Therefore, the net value Metals received for issuing the Senior Notes was grossly disproportionate to the obligations Metals incurred.  Moreover, MagCorp received no consideration for its upstream guarantee of its parent company's obligations to the Indenture Trustee and the continued use of its cash for dividends and other payments to insiders.  In the February 2015 trial of the Renco Group Litigation, the jury determined that the dividends paid to Renco Group in July 1996 (and other dates) were fraudulent conveyances.  If the dividends paid in July 1996 were fraudulent conveyances, then it is likely that the debt incurred by the Debtors in issuing the Senior Notes and the upstream guarantee to facilitate payment of such dividends was also fraudulently incurred.  Therefore, I believe that the claims of the Indenture Trustee may be subject to disallowance as a fraudulent incurrence of indebtedness.

## PBGC Claims

88.  On the theory that the Debtors are jointly and severally liable with other entities controlled by Renco Group under ERISA, the PBGC filed against each Debtor (a) six contingent claims in an aggregate amount exceeding $119,000,000 for estimated unfunded benefits liabilities, and (b) 33 contingent unliquidated claims for unpaid minimum funding contributions and statutory liability under 29 USC § 1307.  I negotiated a consensual resolution with the PBGC, under which the PBGC agreed to withdraw all of its claims without any payment thereon.  On May 7, 2019, my counsel filed a stipulation and order on consent to such effect, thereby sparing other creditors from substantial dilution and significant expense to the estates of litigating objections to the PBGC's claims.

## Insider Claims

89.  Renco Group and other insiders (collectively, the "Insiders") have filed various
claims against the estates (the "Insider Claims"), including most significantly: (a) unliquidated
claims filed by Renco Group and US Mag for reimbursement contingent on the outcome of the
Utah Environmental Litigation or other environmental enforcement action; (b) contingent
unliquidated claims filed by Renco Group and Rennert under Section 502(h) for amounts paid to
me with respect to the Amended Judgment, *i.e.*, in excess of $214 million; and (c) loans by
certain Insiders to the Debtors in the aggregate amount of approximately $1.2 million ("Insider
Loans").  I believe that all of the Insider Claims may be subject to either disallowance or
equitable subordination to the claims of other creditors.  Moreover, the Insider Loans may also
be subject to being recharacterized as equity because, *inter alia*, the Debtors were
undercapitalized as a result of paying over $100 million in dividends and redemption of stock,
and the Insider Loans were more in the nature of capital contributions.  Nevertheless, the Insider
Claims and the Renco Adversary Proceeding may delay and possibly dilute distributions to non-
insider creditors.

## Estate Allocation Issues

90.  I prosecuted the Renco Group Litigation on behalf of both Debtors.  Whether the
fraudulently conveyed funds belonged to MagCorp or Metals was not an issue in that lawsuit and
was not decided by the jury.  Other than approximately $7.2 million paid directly by MagCorp to
certain of its officers, the funds at issue in the Renco Group Litigation were up-streamed from
MagCorp to Metals, and then from Metals to Renco Group.  Therefore, creditors of Metals can
argue that the vast majority of the transfers actually avoided in the case were from Metals to
Renco Group, and thus Metals should get most of the proceeds.  On the other hand, Metals was
merely a holding company.  In fact, MagCorp was the source of all of the transfers other than the

proceeds raised in the sale of the Senior Notes, and MagCorp was the principal subsidiary of Metals at that time and thus represented the overwhelming source of its borrowing and debt servicing ability.  Therefore, creditors of MagCorp can argue that the funds truly belonged to MagCorp and that Metals was a mere conduit, and thus MagCorp should get all or most of the proceeds.

91.  The two largest non-insider creditors - the Government and the Indenture Trustee - are on opposite sides of the issues relating to the allocation of remaining funds between the estates of the two Debtors, and these issues have been hotly contested by them.  The Government and the Indenture Trustee both assert claims against both Debtors; however, the Government's primary obligor is MagCorp and the Indenture Trustee's primary obligor is Metals.  The Government's claim against Metals is based on CERCLA, substantive consolidation and veil piercing.  Similarly, the Indenture Trustee's claim against MagCorp is based not on a direct relationship, but on an upstream guarantee.  In both instances, the Government and the Indenture Trustee have strong claims against their respective primary obligor but, in my view, weaker claims against the other Debtor.

92.  By order dated August 15, 2018, I was authorized to retain retaining Baker Tilly Virchow Krause, LLP ("Baker Tilly") to provide input on an appropriate allocation of remaining funds, as well as other potential matters that need to be addressed in connection with the Remaining Issues and distributions to creditors.  My counsel and I have had a number of discussions with Baker Tilly, and have received their preliminary views on the allocation issues.

93.  Ultimately, unless the Debtors' estates are substantively consolidated,[6] there needs to be an allocation of the net amount of the Renco Group Litigation proceeds and the Sale Proceeds

---

[6] Substantive consolidation is a judicial remedy utilized where the financial affairs of two or more debtors are inextricably intertwined.  It results in the multiple estates being treated as one entity so that a common fund is used

between the estates of the two Debtors.  Presently, I am holding net proceeds of the Renco Group

Litigation and the AEM sale aggregating approximately $94.8 million (after paying AEM,

professional fees and other estate expenses) in MagCorp bank accounts for administrative

convenience, but without prejudice to anyone's rights as to how such funds should be allocated

between the estates of the two Debtors.

### Renco Adversary Proceeding against Indenture Trustee

94.  On May 27, 2016, Renco Group commenced an adversary proceeding (the "Renco

Adversary Proceeding") against a predecessor in interest to the Indenture Trustee seeking to

prevent the Indenture Trustee and noteholders from recovering on their claims because the

noteholders allegedly ratified the payment of Renco Group's dividends through their

participation in the offering of the Senior Notes that was expressly initiated and consummated to

fund one of those dividends (and authorized the other dividends).  Renco Group asserts that the

claims of noteholders should be disallowed under principles of equitable disallowance, quasi

estoppel, unjust enrichment and under Section 502(d) of the Bankruptcy Code.

95.  I believe the Renco Adversary Proceeding is wholly without merit, and I have

offered to provide information to the Indenture Trustee and the noteholders to assist in their

defense, and have monitored this proceeding.  Among other things, the Renco Adversary

Proceeding completely ignores the fact that the note offering was predicated on false financial

disclosure, including unsustainable projections, and the failure to disclose significant

environmental liabilities and material setbacks with respect to MagCorp's magnesium

manufacturing processes.  Because I am not a party in the Renco Adversary Proceeding, I

believe it would be inappropriate to take an active role therein to assist the noteholders because

---

to pay all creditors irrespective of which debtor they dealt with.  I do not concede that there is any basis for
substantive consolidation in this case.

that would be unfair to other creditors who have no financial stake in the outcome of the Renco Adversary Proceeding.

96. On September 29, 2016, the Indenture Trustee filed a motion to dismiss the complaint in the Renco Adversary Proceeding, which was argued on January 11, 2017. On March 24, 2017, the Court directed the parties "to address the effect of the Summary Order by the United States Court of Appeals for the Second Circuit in *Buchwald v. The Renco Group, Inc., et al.* on the pending motion to dismiss this adversary proceeding." Thereafter, the parties submitted supplemental briefs, and the Court heard argument on May 2, 2017, at which time decision was reserved.

97. On March 30, 2018, the Court issued its Memorandum Opinion and Order granting the Indenture Trustee's motion to dismiss the complaint *in toto* but without prejudice. The Court concluded that Renco Group lacked statutory standing to bring the Renco Adversary Proceeding.

98. On April 13, 2018, Renco Group filed a notice of appeal. On April 18, 2018, the appeal (Case No. 18-03435) was assigned to District Judge Paul A. Crotty. On April 27, 2018, Renco Group filed its Designation of Record and Statement of Issues Presented on Appeal. The Indenture Trustee did not file a counter-designation.

99. On August 8, 2018, Renco Group filed its appellate brief. The opposition brief of the Indenture Trustee was filed on September 7, and Renco Group's reply brief was filed on September 21. It is presently unknown when the District Court will schedule oral argument and issue a ruling on the appeal. However, in light of the Global Settlement and the closeness of the Parties to resolution, on or about April 8, 2019, Renco Group requested that the District Court hold the appeal in abeyance.

**In 2018, I Negotiated a Global Settlement of All Remaining Issues in the Case**

100.  As of September 2017, the largest claims against the Debtors' estates are the claims of the Indenture Trustee in the amount of approximately $169.5 million, the claims of the Government in the amount of at least $127 million (excluding penalties and Chapter 11 administrative claims), the claims of the PBGC in an aggregate amount exceeding $119,000,000 (not counting 33 contingent unliquidated claims), and the Insider Claims of approximately $240 million.

101.  I had concerns over the claims of the Indenture Trustee, the Government, PBGC and the Insiders, which are discussed above.  Moreover, there needed to be (a) a resolution of the Renco Adversary Proceeding, and (b) an allocation of the Renco Group Litigation proceeds and the Sale Proceeds between the estates of the two Debtors.  Alternatively, the issue of whether the estates should be substantively consolidated, which the Government reserved the right to move for in the claims it filed against the estates, would need to be resolved.[7]

102.  I believe it is imperative and in the best interests of the estates to avoid protracted and expensive litigation that would undoubtedly delay a distribution to creditors and needlessly diminish estate resources.  Therefore, in September 2017, I began negotiating a consensual resolution with the Indenture Trustee, the Government, PBGC and the Insiders concerning (a) their respective claims, (b) the Debtors' CERCLA Contribution Claim, (c) how remaining cash should be allocated between the estates of the two Debtors (and its mirror image – whether the estates should be substantively consolidated), and (d) the Renco Adversary Proceeding ("Global Settlement").  As detailed below, these efforts bore fruit in the fall of 2018.

103.  Because the Government and Renco Group were so far apart over the magnitude of the environmental liabilities (despite decades of unproductive and futile discussions and

---

[7] I do not concede that there is any basis for substantive consolidation in this case.

litigation), I believed that a necessary first step to achieving a Global Settlement was to

determine at least an approximate range for the magnitude of the environmental claims. With

assistance from counsel and my environmental consultants, Roux, I investigated the *bona fides*

of the environmental claims. My professionals and I obtained and reviewed voluminous

documents from the Government and the US Mag Parties under Rule 408, confidentiality

agreements and the Protective Order, exchanged hundreds of emails with the parties, and had

numerous telephone conferences and meetings with representatives of the parties.

104. By June 2018, Roux had essentially concluded its preliminary analysis of the

environmental claims, and I had reached a tentative agreement with the Government and

Noteholder Consortium on allowance of their respective claims and an allocation of cash in the

estates. Nevertheless, I believed that it was important to try to include the US Mag Parties in any

settlement to avoid additional litigation which would clearly cause significant delay and expense.

105. Therefore, in July 2018, S&L and I began attempting to broker a settlement

between the Government and the US Mag Parties, which could then be folded into the tentative

agreement I reached earlier this year with the Government and Noteholder Consortium. I also

insisted that any such settlement must also include a resolution of all Insider Claims and the

Renco Adversary Proceeding.

106. As a result of these efforts, the Government and the US Mag Parties exchanged

term sheets in August and September 2018 and agreed to meet in late September. My counsel

and I were invited to mediate a settlement between the Government and the US Mag Parties at a

meeting held at the offices of the United States Department of Justice on September 27, 2018.

While there was some initial acrimony, in the separate one-on-one sessions we were able to

maneuver the parties toward some middle ground and as a result I believed that substantial

progress had been achieved at that meeting.  This belief was reinforced by subsequent events.

For instance, on October 3, 2018, the Government circulated a revised term sheet that reflected

significant movement on the issues that S&L and I had discussed with Government

representatives in the one-on-one sessions.  Likewise, on October 10, 2018, the US Mag Parties

provided comments thereto that reflected movement on the issues that S&L and I had discussed

with their representatives in the September 27th one-on-one sessions and during several follow

up discussions during early October 2018.

107.  The parties conducted a follow up meeting on October 23, 2018, at which virtually

all non-monetary issues were resolved.  The revised term sheet circulated by the Government on

November 2, 2018 incorporated these agreements.

108.  In short, in about four months, S&L and I were able to broker a settlement between

the Government and the US Mag Parties, despite decades of hostility between those parties.

Significantly, in order to broker a deal between the Government and the US Mag Parties, I had to

convince the Government to agree to an unprecedented arrangement.  As the Government is

comprised of numerous federal and state agencies, I am particularly gratified that the

Government recognized the value of our efforts in culminating the agreement.  I credit the

Government for being extremely cooperative and accommodating in achieving this result on a

very expeditious basis.

109.  Despite the agreement I brokered between the Government and the US Mag Parties,

there was still a small monetary gap between the US Mag Parties and the Noteholder

Consortium.  I spearheaded various discussions which narrowed the gap further, and then in an

attempt to break the remaining impasse, I scheduled an all-hands settlement meeting for

November 14, 2018 among the Government, the US Mag Parties and the Noteholder Consortium, at which time the parties moved a bit closer.

110.   At a status conference conducted on November 15, 2018, my counsel advised the Court that substantial progress had been made and the parties were only $2 million apart, which represented approximately 2% of the funds in the estates.  Thereafter, my counsel and I worked tirelessly to bridge the gap between the parties, and we ultimately got the parties to agree, but not before some further posturing.

111.   On November 21, 2018, the Noteholder Consortium filed an application to take Bankruptcy Rule 2004 discovery from me, the Government and Renco Group.  I believed the filing of this application was simply a tactic to gain leverage in ongoing negotiations.[8]  In any event, it was highly counterproductive and presented me with the risk that months of progress would be scuttled.

112.   Since the parties were so close after months of hard work, and to avoid a loss of a spectacular resolution that would spare the estates from years of expensive litigation, on November 29th I imposed a deadline of November 30, 2018 for the parties to agree to a Global Settlement, backed by the threat that I would commence appropriate litigation against whichever parties were unwilling to settle by my deadline.  As a result, the final gap was bridged and on November 30, 2018 the parties did in fact reach an agreement in principle for the terms of a Global Settlement, subject to (a) appropriate documentation, (b) approval by the State of Utah, DOJ, and senior management at EPA, Department of Interior, and BLM, and (c) Bankruptcy Court approval.

---

[8] It was withdrawn on November 30, 2018, a couple of hours after the Global Settlement was reached.

**The Bifurcated Global Settlement**

113.    While all four sets of parties still support the terms of the Global Settlement, it has unfortunately taken far longer than expected to finalize the Global Settlement because of (a) the five-week government shutdown that occurred between December 21, 2018 and January 25, 2019, and (b) the complexities relating to the environmental issues being resolved between the Government and the Renco Parties, which are solely inter-creditor issues that do not affect the Debtors' estates or other creditors.

114.    Therefore, in my business judgment, as negotiations over the Global Settlement got bogged down with no imminent end in sight, I determined to bifurcate the Global Settlement, so that all of the issues that can be resolved at this time are resolved under the an agreement with the Indenture Trustee and Required Noteholders ("Settlement Agreement"), and all open issues (including the complex environmental issues that have caused the delay) are deferred for a separate agreement currently being negotiated among the Governments, the Renco Parties and me.

115.    To that end, in late April 2019, I began negotiations with the Noteholders over a bifurcated arrangement that would provide the Indenture Trustee and Trade Creditors with treatment similar to what they would have received under the Global Settlement.  After exchanging multiple drafts of the proposed agreement and providing them with a copy of my proposed approval motion, the parties were in a position to file the approval motion by May 7, 2019.  Throughout this time, I continued to monitor the negotiations between the Government and the Renco Parties over the Global Settlement, with the perspective that if they closed the gap I would switch gears back to the Global Settlement, and if they failed to close the gap I would move forward with the bifurcated Global Settlement.

116.    Unfortunately, the Government and the Renco Parties failed to resolve their differences over the Global Settlement.  Therefore, on May 7, 2019, I filed a motion (the "Settlement Motion"), pursuant to 11 U.S.C. § 704(a) and Federal Rule of Bankruptcy Procedure 9019, for entry of an order approving the settlement relating to Indenture Trustee Claims, Trade Claims (each as defined in the Settlement Motion), and administrative and priority claims, as memorialized in the Settlement Agreement.

117.    At this time, I do not believe that the Governments and the Renco Parties will support the bifurcated Settlement Agreement.  Nevertheless, bifurcating the Global Settlement is the only path that makes sense under the present circumstances, and is the most expeditious and efficient way to move the settlement process forward, hopefully culminating in the fully complete Global Settlement.  Moreover, while I am fully prepared to move forward with the Settlement Motion, I continue to hope that the filing of the Settlement Motion will provide the needed impetus to finally implement the Global Settlement that is supported by all major constituencies.  As of the date of this Report, the Settlement Agreement appears to be doing just that as the Government and the Renco Parties have continued to make progress with continued input and assistance by me and my counsel.

118.    As set forth in greater detail in the Settlement Agreement, the resolution reached by the Parties thereto is comprised of the following material terms:

- I will make final irrevocable distributions to the Indenture Trustee and Trade Creditors in full satisfaction of their respective claims (and the claims of any Noteholders) in amounts no more favorable than they would have received under the Global Settlement, *viz.*, (a) $47,231,796 for the Indenture Trustee; and (b) $1,201,024 for Trade Creditors as set forth in Schedule I(A)(b) of the Settlement Agreement ("Final Distributions").  The Indenture Trustee, Noteholders and Trade Creditors shall not be entitled to any further distributions from the Debtors' estates and their respective claims shall be deemed withdrawn with prejudice and expunged immediately after the Final Distributions.  To the extent that any or all of the Final Distributions are required to be refunded or returned or otherwise disgorged, then the

claims of the Indenture Trustee and Trade Creditors shall be reinstated and may be asserted and pursued in the Bankruptcy Cases.  The Indenture Trustee shall be deemed to have an allowed general unsecured claim in the amount of $169,572,520.83, without prejudice to the rights of the Governments or the Renco Parties to challenge; as between themselves, against which estate or estates such claim should have been allowed; provided, however, for the avoidance of doubt, the distributions made to the Required Noteholders and/or Indenture Trustee hereunder are final and not subject to any challenge and no challenge against which estate or estates such claim should have been allowed, even if successful, will impact the distributions made to the Required Noteholders and/or Indenture Trustee herein.. None of the Noteholders shall have an individual allowed claim for monies owed under the Indenture;[9]

- Upon the Effective Date (as defined in the Settlement Agreement), I will pay in full from available estate funds all allowed Chapter 11 administrative expense claims (other than the claims of the Governments) and all allowed claims against the Debtors' estates entitled to prepetition priority under Bankruptcy Code section 507, in the aggregate amount of $774,347.56, as specified in Schedule II of the Settlement Agreement;[10]

- I will grant releases to the Indenture Trustee, and each past and present member of the Ad Hoc Noteholder Consortium;[11]

- I will establish the Reserve Fund in the amount of $1.5 million to be used to reimburse the Indenture Trustee Parties for any reasonable costs and expenses, including attorneys' fees and amounts payable under the Indemnity, that they incur after the Effective Date with respect to any litigation relating to the Bankruptcy Cases including, without limitation, with the Renco Parties, including without limitation the Renco Adversary Proceeding, Renco's appeal therefrom, any appeal from entry of the order approving this Agreement, and any further proceedings in connection with any of the foregoing;[12]

- Except as expressly provided in the Settlement Agreement, all claims, causes of action, rights, remedies, and defenses between the Governments and the Renco Parties vis-à-vis each other and the Debtors' estates, and between me and the Governments, the Renco Parties and other Insiders, including without limitation allowance or disallowance of the claims of the Governments, the Renco Parties and other Insiders, allocation of funds between the Debtors' estates, or issues concerning the Rowley Site, the Knolls Facility, CERCLA, RCRA, other federal or state laws, or otherwise are expressly reserved.[13]

---

[9] *See* Settlement Agreement Art. I.
[10] *See id.* Art. II.
[11] *See id.* Art. III.
[12] *See id.* Art. IV.
[13] *See id.* Art. V.

119.  After making the payments called for under the Settlement Agreement, I will have approximately $45.6 million remaining in the estates.  While the Settlement Agreement does not specify any deadlines to obtain approval thereof or to effectuate the initial distribution, it is my understanding that if the Final Distributions cannot be effectuated by mid-2019 at the latest, then the Required Noteholders are unlikely to continue to support the Settlement.

120.  The Settlement Agreement is subject to approval by the Bankruptcy Court at a hearing currently scheduled for June 12, 2019.  Nevertheless, the Parties to the Settlement Agreement have agreed that if the Renco Parties and the Government fully resolve all of their open issues pursuant to a fully negotiated settlement agreement (subject to internal approvals of the Government) prior to Bankruptcy Court approval of the Settlement Agreement, then I (in consultation with the Indenture Trustee Parties, the Government and the Renco Parties) shall seek to supplement, modify and/or adjourn the Settlement Motion so that the Bankruptcy Court can instead consider approval of the Global Settlement, provided that such actions would not cause material delay.[14]

121.  Absent this Settlement, if all open issues were fully litigated, the Indenture Trustee might receive a greater share of cash than it is receiving under the Settlement Agreement, which of necessity would dilute the recoveries of other creditors even before factoring in the additional litigation expenses which would further reduce creditor recoveries.  Furthermore, both the Government and the Insiders are the holders of disputed claims who, if all the foregoing issues were litigated, may not fare as well as they would under the Global Settlement, and thus have no basis for objecting to the Settlement Agreement.

122.  It is also noteworthy that the Noteholders and Trade Creditors suffered real pecuniary losses in sums certain, whereas the Government has contingent disputed tort claims in

---

[14] *See id*. Art. VI.

undetermined amounts and Renco's principal claim is for the return of illegal dividends to which it is not entitled.  Moreover, US Mag's CERCLA contribution claim should be disallowed, and to the extent not disallowed would be offset by the amounts distributed on account of the Debtors' CERCLA liability.

123.   Neither the Government nor the Renco Parties will be prejudiced by approval of the Settlement because they can still receive the full benefit of their bargain by finalizing the Global Settlement.  Moreover, their rights are fully preserved in the event the Global Settlement is never achieved.  Thus, there is no reason to countenance any further delay in distributions to other creditors, while the Government and the Renco Parties negotiate endlessly over terms that do not affect the Debtors' estates.

**Beus Gilbert Fee Application**

124.  On December 13, 2017, my special litigation counsel, Beus Gilbert, filed an

application for a final award of compensation in the amount of $88,051,908.61, representing the

agreed 41% of recoveries in the Renco Group Litigation ("Beus Gilbert Fee Application").[15]

Both the Noteholder Consortium and Renco Group filed objections thereto, attempting to revisit

the reasonableness of the compensation arrangement that had been negotiated and approved by

the Court in 2003.

125.  I supported the approval of the Beus Gilbert Fee Application, pointing out, *inter*

*alia*, that (a) without Beus Gilbert's having agreed to take on the representation, there would

have been no recovery at all and the litigation claims would have expired worthless years ago,

(b) Beus Gilbert bore all the expenses of the case for over 14 years, and (c) Beus Gilbert

achieved a spectacular result, recovering about 99% of the damages sought, plus a very

significant award of interest which nearly doubled the verdict amount.

126.  On January 23, 2018, the Court heard argument and reserved decision.  On January

31, 2018, a decision and order was entered overruling the objections and granting the Beus

Gilbert Fee Application in full.  The fees and expenses paid to Beus Gilbert in an aggregate

amount in excess of $90.2 million constitute the single largest disbursement in this case.

**Principal Assets and Liabilities, Collections, Disbursements**

127.  The principal assets of the Debtors' estates are cash in the amount of approximately

$94.9 million, consisting primarily of the proceeds of the Amended Judgment and the Sale

Proceeds (after paying AEM, professional fees and other estate expenses).

---

[15] That percentage applied only if the case went to trial, which it did.  Lower percentages would have applied if the case had been resolved at an earlier stage.  Beus Gilbert had previously sought and in November 2017 was awarded $2,162,250.50 on account of its expenses, without objection.

128.  For several years prior to September 2016, rather than earning interest on bank accounts, the Debtors had to pay fees.  In August 2016, recognizing that the AEM sale would soon provide me with over $26 million, which would give me leverage in negotiations, I began discussions with providers of bankruptcy trustee software and services to obtain a better financial arrangement for the estates.  As a result thereof, in September 2016, I reached an arrangement whereby the Debtors have been earning interest on their bank accounts, rather than paying fees, since that time.

129.  On September 15, 2016, I switched all estate bank accounts from Empire National Bank to Rabobank.  During 2017, the Debtors accounts at Rabobank were earning 0.85% in interest.  After the Second Circuit ruled in my favor in the Renco Group Litigation in March 2017, recognizing that I would likely soon collect in excess of $214 million, which would give me even more leverage in negotiations, I began discussions with banks and providers of bankruptcy trustee software and services to obtain an even better financial arrangement for the estates.

130.  As a result thereof, on November 7, 2017, I transferred all funds of both estates to East West Bank.  I did so to earn a much higher rate of interest on the sizable amount of funds in the estates following the receipt of the proceeds from the Renco Litigation.  The interest rate was adjusted based on the Fed Funds Effective Rate, as it changes from time to time.  Until recently, the estates were earning 2.65% on deposited funds at East West Bank.  In order to obtain trustee management software at no cost, I had to agree to maintain $10 million in a separate account at 0.4% at East West Bank.  Subsequently, on April 2, 2019 I transferred that $10 million separate account to Axos Bank for an improved rate of 2.0% and continued to access trustee management software at no cost.

131.  Due to market conditions, in early May 2019, East West Bank reduced the rate I was earning on the bulk of the Debtors' funds from 2.65% to 2.20%.  As a result, I again negotiated a better rate from a competing bank, and on May 9, 2009, I transferred $84.9 million to Axos Bank where such funds are assured of earning 2.45% on a going forward basis regardless of whether the Fed Funds Effective Rate or market rates decrease further.  As a result, I now have all of the estates' assets – approximately $94.9 million – at Axos Bank earning 2.45%.

132.  I am very satisfied with the foregoing arrangements which were arrived at by my efforts to achieve the best outcome for the estates following a competitive marketing process.  I am not aware of any other such favorable arrangements for trustees.  Furthermore, the interest earnings on bank deposits have served to defray ongoing expenses.  The Debtors do not pay any income taxes on the interest earnings because they are QSubs (qualified S corporation subsidiaries) of Renco Group, and thus they do not have an independent existence for tax purposes.  Renco Group is responsible for taxes with respect to any income earned by the Debtors.

133.  My last report was filed on December 4, 2018 [Docket No. 1118], which covered the seven-month period between May 1, 2018 and November 30, 2018.  Between December 1, 2018 and April 30, 2019, on behalf of MagCorp, I collected $943,190.86, and I disbursed $968,185.23   Between December 1, 2018 and April 30, 2019, on behalf of Metals, I collected $33.17, and I disbursed $0.00.

134.  Since my appointment as chapter 7 trustee herein through April 30, 2019, on behalf of MagCorp, I have collected $246,522,914.05 and disbursed $151,664,129.94.  Since my appointment as chapter 7 trustee herein, on behalf of Metals, I have collected $4,607.34disbursed

$1,456.97. Since my appointment as chapter 7 trustee herein through April 30, 2019, I have paid an aggregate of $99,732,099.18 on account of fees and expenses to estate professionals (including trustee's commissions and Chapter 11 professionals), of which $90,214,159.11 was paid to Beus Gilbert.

135. The Debtors' principal liabilities are discussed above. The claims of trade creditors aggregate $4,223,853. Chapter 11 administrative expenses (excluding the Government) and pre-petition priority claims aggregate $774,347.56.

## Case Status and Remaining Issues

136. I am presently seeking approval of the Settlement Agreement, but continue my efforts to finalize, document and obtain approval of the Global Settlement discussed above.

Dated: New York, New York
May 14, 2019


s/ Lee E. Buchwald
Lee E. Buchwald, Trustee

TO:    UNITED STATES TRUSTEE
201 Varick Street, Room 1006
New York, NY 10014
Attn: William K. Harrington, Esq.